# Exhibit 47, Part 1 of 5

# LIONBRIDGE

STATE OF NEW YORK     )
                                     )
                                   )     ss
COUNTY OF NEW YORK   )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Danish into English of the attached letter, dated July 07, 2020.

_____

Lynda Green, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this  1  day of  June  , 20 22  .

JEFFREY AARON CURETON
NOTARY PUBLIC-STATE OF NEW YORK
No. 01CU6169789
Qualified in New York County
My Commission Expires 09-23-2023

259 W 30th Street, 11th Floor  New York, NY 10001  +1.212.631.7432

[logo]
Danish Tax Appeals Board

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S
Vester Farimagsgade 23
1606 Copenhagen V
Denmark
Attention: Steffen Svaerke

**Contact**
Send a mail to the
Danish Tax Appeals Board here

**Telephone**        3376 0909

**Case Worker**

**Anette Duvald**
**Direct Telephone**        33760921

**Our Case No.**        18-0005426

**Your Case No.**        4001154 SS/ISA

July 07, 2020

**Mail from the Danish Tax Appeals Board**

You hereby receive a copy of a letter from the Danish Tax Appeals Board.

We ask that you to refer to the case number received by the Danish Tax Appeals Board, if you need to contact us regarding this letter.

Yours sincerely,

The Danish Tax Appeals Board

[logo]
Danish Tax Appeals Board

American Investment Group Of New York, L.P. Pension Plan

75 Claremont Rd Suite 309,

Bernardsville NJ 07294

United States of America

**Contact**
Send a mail to the
Danish Tax Appeals Board here

**Telephone**    3376 0909

**Case Worker**

**Anette Duvald**

**Direct Telephone**    33760921

**Our Case No.**    18-0005426

**Your Case No.**

July 07, 2020

**Decision**

On behalf of American Investment Group Of New York, L.P. Pension Plan an appeal has been filed against the decision dated May 04, 2018, that was made by the Danish Tax Agency. The Danish National Tax Tribunal has now made a decision in the matter. The decision is attached.

**Guidelines for legal proceedings**
The decision may be appealed no later than 3 months after the date of the decision. The rules on judicial review are set out in Sections 48-49 of the Danish Tax Administration Act.

The case must be brought before the district court where the taxpayer is domiciled. The summons is to be served on the Ministry of Taxation, Nicolai Eigtveds Gade 28, 1402 Copenhagen K. The detailed instructions for bringing a case before the court can be found on www.domstol.dk.

Sincerely,

Lisbeth Larsen

Corp. ID No. 10 24 28 94

www.skatteankestyrelsen.dk

# Decision
# from
# The Danish National Tax Tribunal

[stamp:] JULY 07, 2020

Case No. 18-0005426

The following participated in the decision: Susanne Dahl, Bodil Toftemann, Poul Erik Nielsen and Tine Roed

Appellant:                                        American Investment Group of New York, L.P. Pension Plan

Matter being appealed:                   The decision made by The Danish Tax Agency dated May 4, 2018

The Danish Tax Agency has revoked previous decisions regarding the refunding of dividend taxes.

The Danish National Tax Tribunal upholds the decision made by the Danish Tax Agency.

**Meeting etc.**
A meeting was held with the representative of the American Investment Group of New York, L.P. Pension Plan, who also had the opportunity to make a statement at a court hearing.

**Factual information**
American Investment Group of New York, L.P. Pension Plan (the Pension Plan), incorporated on October 29, 2002, is registered as a pension fund in the United States of America.

In 2014 and 2015, at the request of the Pension Plan's agent, Goal Taxback Limited, the Danish Tax Agency paid a refund of dividend tax via Goal Taxback Limited's bank account at NatWest Bank.

On behalf of the Pension Plan, Goal Taxback Limited has submitted the following requests to the Danish Tax Agency for a refund of withheld dividend tax of a total of DKK 21,060,000 in respect of the following shares:

| Stock | Date of request | Number of shares | Ex-date | Total dividend in DKK | Refunded dividend tax in DKK |
|---|---|---|---|---|---|
| Coloplast A/S - B | 03/05/2014 | 500,000 | 12/06/2013 | 3,500,000 | 945,000 |
| TDC A/S | 03/26/2014 | 5,000,000 | 03/07/2014 | 11,000,000 | 2,970,000 |
| Danske Bank AIS | 04/04/2014 | 7,750,000 | 03/19/2014 | 15,500,000 | 4,185,000 |

| | | | | | |
|---|---|---|---|---|---|
| Novo Nordisk A/S B | 04/04/2014 | 3,500,000 | 03/21/2014 | 15,750,000 | 4,252,500 |
| A.P. Møller Maersk A/S B | 04/16/2014 | 1,000 | 04/01/2014 | 1,400,000 | 378,000 |
| Tryg A/S | 04/16/2015 | 50,000 | 04/04/2014 | 1,350,000 | 364,500 |
| TDC A/S | 08/14/2014 | 3,400,000 | 08/08/2014 | 5,100,000 | 1,377,000 |
| Chr. Hansen Holding A/S | 12/03/2014 | 800,000 | 11/28/2014 | 3,016,000 | 814,320 |
| Coloplast A/S - B | 12/10/2014 | 1,500,000 | 12/05/2014 | 11,250,000 | 3,037,500 |
| Novozymes A/S B | 03/04/2015 | 750,000 | 02/26/2015 | 2,250,000 | 607,500 |
| A.P. Møller Maersk A/S B | 04/08/2015 | 4,000 | 03/31/2015 | 7,884,000 | 2,128,680 |
| Total | | | | 78,000,000 | 21,060,000 |

The requests were accompanied by the following appendices:

1. Form 06.003 ENG - Claim to Relief from Danish Dividend Tax.
2. Tax Vouchers - prepared by the Pension Plan's custodian ED&F Man Capital Markets Limited (ED&F Man). FORM 6166
3. from Internal Revenue Service (IRS) - Certificate of resident in USA (issued by the U.S. Internal Revenue Service).
4. Power of Attorney dated February 19, 2014, for Goal Taxback Limited signed by Trustee Stacey Kaminer.

Concerning 1. Form 06.003 declares that, the Pension Plan is the legal owner of the shares and is covered by the Double Taxation Convention between Denmark and the United States.

Concerning 2. According to Tax Vouchers prepared by custodian ED&F Man, the Pension Plan received net dividend of the shares.

Assuming that the Pension Plan must own the shares at the time of the General Meeting (the day before the ex-date), the acquisition cost of the Pension Plan's purchase of the shares stated in the request is calculated on the basis of the closing price on the last trading day before the ex-date:

| Share | Price date | Quantity | Price | Estimated acquisition cost in DKK |
|---|---|---|---|---|
| Coloplast A/S - B | 12/05/2013 | 500,000 | 358.30 | 179,150,000 |
| TDC A/S | 03/06/2014 | 5,000,000 | 52.65 | 263,250,000 |
| Danske Bank A/S | 03/18/2014 | 7,750,000 | 145.70 | 1,129,175,500 |
| Novo Nordisk A/S B | 03/20/2014 | 3,500,000 | 245.80 | 860,300,000 |
| A.P. Møller Maersk A/S B | 03/31/2014 | 1,000 | 65,000.00 | 65,000,000 |
| Tryg A/S | 04/03/2014 | 50,000 | 551.50 | 27,575,000 |
| TDC A/S | 08/07/2014 | 3,400,000 | 51.35 | 174,590,000 |
| Chr. Hansen Holding A/S | 11/27/2014 | 800,000 | 258.90 | 207,120,000 |
| Coloplast A/S - B | 12/04/2014 | 1,500,000 | 527.00 | 790,500,000 |
| Novozymes A/S B | 02/25/2015 | 750,000 | 322.50 | 241,875,000 |
| A.P. Møller Maersk A/S B | 03/20/2015 | 4,000 | 16,410.00 | 65,640,000 |

All shares in Danish listed companies are registered with VP Securities, which is the Danish securities depository.

This registration includes a securities account in a Danish bank set up in the name of a shareholder. A securities account contains the shareholder's shareholdings, which may be composed of shares in various Danish listed companies. A securities account and its holdings may also have several owners (referred to as an omnibus account).

A search of information from VP Securities has not revealed any securities account in a Danish bank where the Pension Plan is registered as owner.

The Danish Tax Agency has received information from the IRS in the United States through the competent authority in Denmark and the United States.

In a letter dated August 03, 2016, the IRS stated:

-   That the IRS has received information from the Retirement Plan in FORM 5500-EZ for 2013 and FORM 5500 SF (Short Form) for 2014
-   That the IRS has stated that the Pension Plan has not filed FORM 5500 for 2015
-   The information from the forms received shows that the Pension Plan's assets at year-end and the number of participants in 2012, 2013, and 2014 amount to:

| Calendar year | Assets/wealth in USD according to FORM 5500-EZ/SF | DKK exchange rate at year-end | Equivalent DKK | Number of active participants |
|---|---|---|---|---|
| 2012 | 4,529,723 | 5.6591 | 25,634,155 | 1 |
| 2013 | 4,893,956 | 5.4127 | 26,489,516 | 1 |
| 2014 | 5,309,103 | 6.1214 | 32,499,143 | 1 |

In connection with general questions about pension plans and contributions to them, the IRS has submitted links to the IRS website regarding "Topics for Retirement Plans." The website states, among other things, the following:

-   That a One-Participant 401(k) plan covers a business owner with no employees other than the person and his or her related persons.
-   That the annual deposit is limited to between USD 12,500 and USD 53,000 depending on the age of the depositor (over or under 50 years).

The IRS has provided the Danish Tax Authority, the Competent Authority, with the following general information:

-   That if a pension plan does not file FORM 5500, the pension plan is indicating that it is a "One-Participant (owners and Their Spouses) Retirement Plan."
-   That if a tax-exempt retirement plan operates a business (Unrelated Business Income), it must pay taxes on the income from that business and must file Form 990-T with the IRS.
-   That if a tax-exempt retirement plan has Dept-Finances income, then tax must be paid on the income therefrom and Form 990-T must be filed with the IRS.
-   That if a pension plan distributes funds, this must be reported to the IRS on Form 1099, stating how much was paid out and to whom. The person who received the funds is taxable on the income and must file a tax return.

It appears from the Amended Defense dated September 05, 2019, that ED&F Man issued 420 Tax Vouchers to their clients, of which 89 Tax Vouchers were incorrect, so that the Pension Plan was paid dividend refunds of DKK 8,613,000 on the basis of incorrect Tax Vouchers.

On behalf of the Danish Tax Agency, the Chamber of Advocates has stated that ED&F Man has acquired 800,000 Chr. Hansen Holding shares for DKK 0, which in the opinion of the Chamber Advocate is probably an indication that ED&F Man has borrowed the shares, so that withholding tax on these shares could not be recovered.

The Danish Tax Agency has requested additional information and documentation from the representative for use in the case, including financial statements for the Pension Plan for the years 2012 - 2015, bank statements for the Pension Plan for the years 2012 - 2015, and bank statements for the Pension Plan from the account at ED&F Man for the years 2014 - 2015.

On June 11, 2019, the representative presented, among other things, Account Equity relating to the purchase of shares and a transcript from the banks' joint SWIFT system (SWIFT = Society for Worldwide Interbank Financial Telecommunication).

Furthermore, Cash Equity Confirmation from Volcafe and emails to and from ED&F Man regarding the purchase and sale of shares have also been provided.

Finally, Account Transactions (General Ledger) relating to the purchase and sale of shares and Account Equity relating to holdings of shares, futures and swaps have also been provided.

### Decision from the Danish Tax Agency

The Danish Tax Agency has revoked previous decisions on the refund of dividend taxes of a total of DKK 21,060,000 to the Pension Plan, as the Pension Plan has not been entitled to receive the dividend tax.

The Danish Tax Agency has stated the following:

> "The Law Firm Lundgrens has argued on behalf of AMERICAN, that AMERICAN has been the rightful owner of the shares in question and that the recovery of the withholding tax has been justified.

> It is stated in the opposition that AMERICAN has purchased the shares which form the basis for the dividends received and for the recovery of tax that has been withheld.

> It is further stated that the usual written confirmation of the purchase has been submitted from AMERICAN's brokers, just as it is stated that the Danish Tax Agency has received documentation in the form of account statements from ED&F Man Capital Markets Limited, from which it appears that payment has been made for the purchase of the shares in question. In addition, it appears from a "Dividend Credit Advice" that AMERICAN has received the dividend and that dividend tax has been withheld from it.

> Finally, the Law Firm Lundgrens states that the submitted documentation is in accordance with what the Danish Tax Agency has accepted as sufficient according to established practices, that has been accepted as being sufficient for many years.

> The Law Firm Lundgrens notes in the Statement of opposition, that the Danish Tax Agency in its proposal has found that AMERICAN has not had a sufficient capital base to be able to make the share purchases in question. In this regard, the Law Firm Lundgrens, states that the Danish Tax Agency does not appear to have addressed

either in general, or specifically the issue of equity financing, including AMERICAN's specific ability to obtain external financing for the equity purchases. However, the Statement of opposition does not disclose whether AMERICAN obtained financing for the purchase of shares without using equity.

In connection with an earlier review of a request from AMERICAN for reimbursement of dividend tax, the Danish Tax Agency has received new information from the IRS on AMERICAN's assets. Based on the new information, the Danish Tax Agency has performed an audit of AMERICAN's previously refunded dividend taxes.

AMERICAN's assets show that AMERICAN could not have owned shares to the extent disclosed, therefore, the Danish Tax Agency does not consider the Dividend Credit Advice (Tax Voucher) to be sufficient evidence that the pension fund has owned the shares and received dividends on such shares.

In connection with the previous review of AMERICAN's request for a refund of dividend tax, the Danish Tax Agency has received selected parts of material from the brokerage company ED&F Man Capital Markets Ltd. The transcripts are incomplete, with pages missing, and much of the text on the pages received by the Danish Tax Agency was illegible, due to text being crossed out. According to Lundgren's Statement of opposition, the material shows that AMERICAN purchased the shares and received the dividends. However, the statement of opposition does not explain how this is shown in the material. The material received is incomplete and deficient. It does not document AMERICAN's ownership of the shares in question or AMERICAN's receipt of the dividends.

The Law Firm Lundgrens has not denied that AMERICAN did not have sufficient capital basis for making the investments in question. They merely referred to the fact that the Danish Tax Agency had not considered the possibility of AMERICAN obtaining external financing for the transactions in question. The Lundgrens Law Firm has neither stated nor documented that AMERICAN obtained external financing for the purchase of the shares.

The Law Firm Lundgrens has not provided any evidence in its Statement of opposition, stating:
- That AMERICAN has bought the shares.
- That AMERICAN has received dividends on the shares.
- That dividend tax is included in the share dividends.

Similarly, the Law Firm Lundgrens has not provided evidence that AMERICAN had the necessary capital available to make the very significant investments in Danish shares that form the basis for the relevant requests for a refund of dividend tax.

Therefore, AMERICAN has not demonstrated that AMERICAN met the conditions for a refund of dividend taxes on the shares in question.

As a result of this, it remains the assessment of the Danish Tax Agency, that AMERICAN does not own or have ever owned the shares identified in the requests for reimbursement and that the dividends relating to the shares identified in the requests have not accrued to AMERICAN.

As a result of this, the Danish Tax Agency will therefore make their decision in accordance with the previously submitted proposal.

The Chamber Advocate will, on behalf of the Danish Tax Agency, raise a claim against AMERICAN for repayment and compensation of damages."

## Opinion of the Pension Plan

The Pension Plan's representative has requested that the Danish Tax Agency's decision from May 04, 2018, be amended so as to confirm the Danish Tax Agency's previous decisions on the refund of dividend taxes to the Pension Plan for a total of DKK 21,060,000.

The Pension Plan was established on October 29, 2002, and is a US pension plan which is exempt from tax under US domestic rules, and which is exempt from the payment of withholding tax on dividend distributions from Denmark under the Double Taxation Convention between Denmark and the US.

During the period from 2015 to 2015 [sic], the Pension Plan invested in Danish equities and received dividends on these equities. In connection with the payment of these dividends, withholding tax has been included on the dividend payment. The Pension Plan has subsequently applied for payment of these dividend taxes, which the Danish Tax Agency has approved.

The present case concerns the fact that the Danish Tax Agency has now revoked these earlier decisions in the decision under appeal, whereby the Danish Tax Agency recognized the Pension Plan's right to be paid the withheld dividend tax.

The representative further stated:

> "1. The reasoning for the investment
>
> American Investment Group Of New York L.P. Pension Plan (American) was established on October 29, 2002. Since its inception, American has made numerous investments in both U.S. and foreign (non-U.S.) securities, financial products and contracts, etc.
>
> In 2014 (12 years after the foundation) the appellant started to inform themselves about investments in Danish shares. After examining the market conditions for equity investments in Danish shares, the appellant decided to add the investments in question to the portfolio of investments that the appellant was already making under the auspices of the brokerage company ED&F Man Capital Markets Limited.
>
> ED&F Man Capital Markets Limited, part of the ED&F Man Group, is a large and reputable global financial brokerage firm, authorized and regulated by the Financial Conduct Authority ("FCA") (194926). The Company has its registered office at 3 London Bridge Street, London, SE1 9SG and is registered in England with a company registration number similar to the Danish Corporate ID No. 1292851.
>
> ED&F Man Group was established in 1783 and today employs around 6,000 people in 60 countries.
>
> In the course of the cooperation between the appellant and ED&F Man Capital Markets Limited, a number of framework agreements were concluded which formed the basis for the cooperation and the investments which the appellant chose to make in the following years.
>
> The appellant does not have (and has never had) any overlapping interests with ED&F Man Capital Market Ltd.
>
> For a better understanding of ED&F Man Capital Markets Ltd's general services, please refer to the company's website, which states, among other things:
>
> "We provide fixed income, equity and commodity exchange-traded funds and source liquidity for listed and OTC block trades. We help customers from banks to hedge and real money funds with algorithmic trading strategies and voice, electronic, chat, and FIX staged access."
>
> "We provide equity crossing in pan-European, Asian, US and Canadian equities. With a client base across Europe, North America and Asia-Pacific, we can quickly execute over-the-counter or on-exchange trades. We also offer execution and clearing of ICE and Eurex single stock futures and options."

"We provide clearing and settlement for equities and fixed-income securities. We offer global services for on-exchange securities deals and settlement, and custodian services for on-exchange and over- the-counter transactions. We can provide a full list of markets covered on request."

"We provide specialized securities lending and financing services to hedge funds and proprietary trading firms."

As stated above, ED&F Man Capital Markets Ltd. offers its clients a wide range of different investment opportunities in all types of securities etc.

<u>2. The investments made</u>

As mentioned above, the appellant was formed on October 29, 2002, and has since made financial investments, including with ED&F Man Capital Market Limited.

In 2014, the appellant was advised to invest in Danish equities - partly as a result of the fact that, as a US pension plan, the appellant is entitled to a 100% refund of Danish withholding tax on dividends.

On the basis of this, in 2014 and 2015, the appellant made a total of 11 trades in Danish listed shares, all of which yielded dividends, where the usual withholding tax on the dividend was included, and where the withheld dividend tax was subsequently requested to be refunded by the appellant.

**********

As mentioned above, the appellant has for many years made investments in securities in a number of different countries. In order not to have to familiarize themselves with the recovery procedure in each country, the appellant has for several years used various professional service providers to handle the practical recovery of withheld dividend tax according to the rules that apply to investments in the country in question.

After the appellant began investing through ED&F Man Capital Markets Limited in 2014, the appellant was introduced to Goal TaxBack, with whom ED&F Man Capital Markets Ltd. had a partnership. Goal TaxBack provides the service of reclaiming withheld dividend tax for foreign investors.

As a result of these circumstances, the appellant issued a power of attorney to Goal TaxBack in order for Goal TaxBack to recover the withheld dividend tax. The power of attorney issued for this purpose is attached as **Appendix 2**.

In connection with the recovery of withheld dividend tax, Goal TaxBack, on behalf of the appellant, submitted a request for refund of the withheld dividend tax.

**Appendix 3** presents a form for claiming a refund on dividend tax (Form 06.003 (ENG)) filled out by Goal TaxBack, which contains all the information that the Danish Tax Agency - then and now - requires in order to be able to decide on the refund of the withheld dividend tax. The request from Goal TaxBack thus contained the following documents:

- A dividend declaration (Tax Voucher) documenting the dividend distribution and the dividend tax withheld.
- A so-called "place of residence statement", which must prove that the person (natural or legal) recovering the dividend tax is resident for tax purposes in the country with which Denmark has concluded a double taxation agreement allowing the recovery of withheld dividend tax.

This "place of residence statement" ("Form 6166") issued by the U.S. Department of the Treasury, is attached as **Appendix 4**. It states that the appellant is a pension plan that for tax purposes is resident in the United States and is exempt from U.S. tax liability. In addition to proving that the appellant is a US tax resident, the declaration also proves that the appellant is a US pension plan and therefore, under Article 10(3) of the Danish-US Double Tax Convention, the appellant is entitled to a refund of the entire dividend tax.

It should be emphasized that this Form 6166 is a standard form used by the U.S. Treasury Department as documentation for the recovery of dividend taxes under all double tax treaties entered into by the United States. It is therefore not a form specifically designed for appeals, or specifically for the recovery of dividend tax from Danish shares.

On the basis of these documents, Goal TaxBack recovered the withheld dividend tax on the distribution made on the shares owned by the appellant at the time of the distribution.

Following the Danish Tax Agency's review of the above material, the Danish Tax Agency decided to pay the withheld dividend tax, as the appellant was entitled to 100% of the withheld dividend tax according to the US-Denmark Double Taxation Convention.

**********

**ALLEGATIONS**

In support of the plea, it is generally argued that the appellant was the beneficial owner of the shares in question at the time of the adoption of the dividend distribution.

Under Danish rules, the owner of the shares at 11:59:59 p.m. on the day of the General Meeting's adoption of the dividend distribution is deemed to be the rightful owner of the distributed dividend and thus also the person entitled to recover the Danish dividend tax withheld on the shares.

The appellant is a legally established and registered pension plan under the Double Taxation Agreement between the United States and Denmark. There is evidence that the appellant is a US tax resident but is exempt from US tax liability, see Appendix 4.

The appellant has received evidence from ED&F Man Capital Market Limited of having owned and held the shares in question at the time of the adoption of the dividend distribution by the distributing company.

The appellant has further received evidence of having received the dividend itself excluding withheld tax. Thus, the appellant has also received documentation that the Danish withholding tax has actually been included in the current dividend distribution.

As a result of this, the appellant therefore fulfils the conditions for a refund of the withheld dividend tax, according to Article 10 of the Double Taxation Agreement between the United States and Denmark.

The appellant was therefore entitled to a refund of the withheld dividend tax, and it is therefore wrong that the Danish Tax Agency in the contested decision revoked its previously favorable administrative act.

**********

The Danish Tax Agency has stated in the order on page 2, that it is the opinion of the Danish Tax Agency, that the reimbursements to the appellant should be presumed to be a fraudulent act, and it is also stated, that the Danish Tax Agency has reported this case (and apparently others) to (SØIK) the State Prosecutor for Serious

economic and International Crime as a result of a suspicion that the appellant did not own the shares
Forming the basis for the recoveries, and as a result of a suspicion that the appellant did not receive the
dividend distribution itself from the distributing company.

Basically, these allegations seem quite detached from the facts of the case.

Furthermore, these allegations are in contradiction with the documentation received by the appellant
from ED&F Man Capital Market Limited and the appellant therefore does not recognize the picture
painted by the Danish Tax Agency in this letter.

The appellant has made customary investments in Danish shares. All these investments -- including the
ownership and receipt of the dividend payments - have resulted in customary payments and postings to
the appellant's account in a large internationally recognized investment firm, which is subject to
supervision by the UK financial authorities.

The documentation provided with the recovery form is and was perfectly usual and also fully sufficient
evidence of both ownership and cash flows. The documentation in question is quite similar to the
documentation that the Danish Tax Agency still recommends enclosing to request for refund of dividend
taxes, and it is quite similar to the documentation that the Danish Tax Agency has required through many
years of established practice.

The appellant has at no time had any reason to doubt the validity of the documentation received by the
appellant from ED&F Man Capital Market Ltd. and the appellant continues to have no reason to doubt
that the entries and records contained in the material provided by ED&F Man Capital Market Ltd. are not
accurate."

**The Danish Tax Appeal Board's ruling**
On October 04, 2019, the Danish Tax Appeal Board issued a ruling in the case, in which the Danish Tax Agency's
decision was upheld.

**The Danish Tax Agency's summary comments from October 18, 2019**

"…
The Pension Plan did not document that it owned the shares which formed the basis for the refund of
withheld dividend tax. The Danish Tax Agency thus agrees with the Danish Tax Appeals Board's ruling from
October 04, 2019.

It is damaging to the Pension Plan's case that the Pension Plan's custodian ED&F Man has <u>now</u> admitted
in a court case brought by the Inland Revenue against ED&F Man in England to having issued a large
number of incorrect Tax Vouchers. The now admittedly incorrect Tax Vouchers have formed the basis for
unjustified refunds of approximately DKK 184 million, see section 4.1. That's a huge amount of money
that ED&F Man has contributed to the Danish Treasury losing.

It is even the case that ED&F Man has _also_ admitted in the <u>appellant's own case to</u> have issued deeply
erroneous Tax Vouchers. The appellant has unjustifiably been reimbursed an amount of DKK 21,060,000.
ED&F Man's admission includes an amount in the appellant's <u>own</u> case of DKK 8,613,000.

Indeed, the Danish Tax Agency has documented that ED&F Man also constructed false documentation for
purposes of certification of stock ownership with respect to the Tax Vouchers that ED&F Man has not
currently admitted are false, cf. Section 5.

A very large part of the Pension Plan's argumentation is based on ED&F Man's credibility. Now it is evident
also by ED&F Man's own admission in the English court case against them that there no credibility
whatsoever

to any of ED&F Man's statements. In fact, the opposite is true: statements made by ED&F Man cannot be trusted.

It took ED&F Man a long time to make this admission in the English proceedings brought by HM Revenue and Customs against ED&F Man. It was previously strongly disputed by ED&F Man that there was anything wrong with their Tax Vouchers. The changing explanations in themselves diminish ED&F Man's credibility.

In all frankness, one can only conclude that the National Tax Tribunal is bound to view any evidence that supports ED&F Man's credibility with the utmost skepticism. And the case of the Pension Plan is based primarily on the assumption that ED&F Man is a credible organization, which they are not - in fact, the opposite is true.

The Pension Plan cannot prove that it paid for shares. Nor can it document that it has received the net proceeds from the shares it claims to have owned or that it has received dividend distributions, see also the Danish Tax Agency's ruling, p. 2, 4th paragraph. On the other hand, it is clear that the Pension Plan did not have the money to purchase the alleged shares.

As stated in the Danish Tax Appeal Board's ruling, p. 2, 4th paragraph, the Pension Plan has not documented that the Pension Plan's custodian, ED&F Man, has traded stock on behalf of the Pension Plan or that the stock transactions, etc., have passed through the Pension Plan's finances. The Danish Tax Appeal Board's ruling is very solidly grounded in the facts of the case.

In itself, it is implausible that the Pension Plan, without significant assets, is buying such large amounts of shares as they have alleged. This impression is considerably reinforced when the Pension Plan does not provide documentation for cash flows to/from the Pension Plan's own (bank) accounts, see also the National Tax Tribunal's ruling, p. 2, 4th paragraph. It is consistent that none of the pension plans represented by the Lundgrens Law Firm provide bank statements, let alone an explanation as to *why* they do not provide own bank statements.

In more detail, the Danish Tax Agency notes the following:

Content

1. INTRODUCTION                                                                                                      4
2. THE MAIN FEATURES OF THE CASES                                                                                    5
   2.1    Fraud cases worth DKK 12.7 billion.                                                                        5
   2.2    The specific case: American Investment Group of New York, L.P. Pension Plan                                6
   2.3    Pension plans represented by Lundgrens in the 1st wave of cases                                            7
   2.4    The Pension Plan did not own shares and did not receive dividends                                          9
   2.5    The Pension Plan's alleged set-up is unclear and undocumented                                             10
3. EVIDENCE                                                                                                         11
4. DOCUMENTATION FROM ED&F MAN HAS NO EVIDENTIAL VALUE                                                              12
   4.1    ED&F One has admitted wrong Tax Vouchers for about 184 million DKK.                                       13
   4.2    ED&F Man concrete error 1: Incorrect currency conversion                                                  15
   4.3    ED&F Man concrete error 2: Shareholding                                                                   16
   4.4    ED&F Man concrete error 3: Inconsistency between share purchase and Credit Advices                        17
   4.5    Share purchase: terms of settlement not in line with market                                               17
   4.6    Several of the alleged stock trades were made through a coffee company                                    19
5. THE METHODOLOGY OF ED&F ONE SHOWS CREATIVE ACCOUNTING                                                            20
   5.1    Chr. Hansen shares - 2014                                                                                 21
          5.1.1    ED&F Man documentation for purchase is contrived and of no probative value                       22
          5.1.2    ED&F Ownership has been certified contrary to the facts                                          23
          5.1.3    Has ED&F Man attempted to mask the facts?                                                        25
   5.2    TDC shares - 2014                                                                                         26

| | 5.2.1 | ED&F Man documentation for purchase is contrived and of no evidential value | 27 |
|---|---|---|---|
| | 5.2.2 | ED&F Man documentation for ownership and sale is constructed and contrary to the facts | 29 |
| | 5.2.3 | ED&F It has never purchased, owned or disposed of the alleged 2,901,000 TDC shares | 31 |
| 6. | LACK OF DOCUMENTATION AND INCONSISTENT SET-UP | | 32 |
| | 6.1 | Purchase and sale confirmations provided do not document that the Pension Plan has bought shares | 32 |
| | 6.2 | The Pension Plan had no money and has not received any net dividends | 33 |
| | 6.3 | There is no evidence of funding | 34 |
| | 6.4 | There is no link between equities and the Pension Plan's finances | 35 |
| 7. | THE PENSION PLAN HAS ONLY PARTIALLY RESPONDED TO THE DANISH TAX AGENCY'S REQUESTS | | 37 |

## 1.    Introduction

In addition to the Pension Plan in this leading case, the Lundgrens Law Firm in the 1st wave of complaints in this group of cases represents 9 other US pension plans and 2 non-US pension plans.

On the basis of alleged ownership of Danish shares, the pension plans have each been paid multi-million amounts of Danish Kroner in refunds of withheld dividend tax; in this leading case approximately DKK 21 million and in the other cases from DKK 4.2 million to DKK 104 million.

The Pension Plan cannot prove that it owned the alleged shares and received (net) dividends therefrom.

The Pension Plan's equity was far from sufficient to make the alleged investments, and the Pension Plan still has not documented how it would have financed the massive stock purchases, see also the Danish Tax Appeal Board's ruling page 2, 4th paragraph. Yet it claims to have purchased Danish shares worth many millions of DKK (and in one case even more than DKK 1.1 *billion*).

Anyone who buys shares will obviously want to make sure they have proof of ownership, but the Pension Plan apparently has not done this.

In addition, the Pension Plan cannot document where the alleged massive gains have gone.

The Pension Plan has not provided its own account statements. And in general, the case is characterized by a total lack of documentation of money payments and transfers.

The supporting material is both incomplete and incoherent, which – albeit natural when such an extensive and fictitious set-up has been constructed – is in itself suspicious when it comes to material that is supposed to document stock trading worth several hundred million Danish Kroner.

However, one thing can be deduced from all the supporting material; the system of the alleged stock trading shows quite clearly that they are fictitious deals disguised by purely changing the numbers, see sections 4 and 5 below. It can also be noted that documentation from ED&F Man – which has admitted to having issued false Tax Vouchers which formed the basis for unjustified refunds, see section 4.1 – are constructed in violation of the facts and without probative value.

The Pension Plan's story simply does not add up and does not hold up in the real world.

The Pension Plan's explanation of what happened in the Pension Plan's own case is undocumented and incoherent, and in general leaves many loose ends, cf. section 6 below.

**2.        Brief overview of the cases**

The administrative appeals concern whether the pension plans were eligible for reimbursement of withheld dividend tax. The cases do not concern the reimbursement of amounts paid out. Questions of repayment of the amounts are pending in several jurisdictions, including the United States, Germany and the United Kingdom. All pension plans represented by the Law Firm Lundgrens have been sued for payment. The repayment issue will thus be settled in the civil actions.

**2.1        Fraud case worth DKK 12.7 billion**

The 12 pension plans represented by the Law Firm Lundgrens in the first wave of the case have appealed the Danish Tax Agency's decisions to revoke earlier decisions on the refund of dividend taxes. They are all part of the overall group of cases.

The group of cases concerns systematic fraud with refund of withheld dividend tax from 2012 to 2015, which has resulted in the Danish State being defrauded of a total of approximately DKK 12.7 billion.

These include 277 US pension plans that have claimed – and been paid – refunds of withheld dividend tax. However, the pension plans did not own the shares in question and therefore did not receive (net) dividends. They were therefore not entitled to the refunds in question.

In several cases, the pension plans etc. have together recovered dividend tax on a scale that is simply impossible.

For example, if all the refund requests are taken into account, they would cover more than half of the shares (A and B) in A.P. Møller - Maersk A/S. This cannot possibly be the case, as known Danish funds themselves own more than half of the total shares. In addition, there are shares held by other professional investors.

Another example where refund claims cannot be taken into account is shareholdings in Tryg A/S. In 2015, Tryg made a dividend distribution and (correctly) withheld approximately DKK 123 million in dividend tax. Subsequently, with reference to ownership of shares in Tryg A/S, a refund of withheld dividend tax totaling approximately DKK 151 million has been requested. Of this, the pension plans have recovered a total of approximately DKK 136 million. This means that far more has been requested (and paid out) in refunds than has been withheld. It goes without saying that there can never be a claim for refunds of more than what has been withheld. It should be noted that by no means all shareholders are entitled to a refund.

In other words, there has undoubtedly been fraud with the information on the ownership of Danish shares in the refund applications.

The Danish Tax Agency can refer to the **Supplementary Appendix** for a detailed description of the case and the actors involved.

**2.2        The specific case: American Investment Group of New York, L.P. Pension Plan**

The American Investment Group of New York, L.P. Pension Plan ("AIG") was established in October 2002, see Appendix P.

As agent for AIG, Goal Taxback Ltd. has from March 2014 to April 2015 applied to the Danish Tax Agency for refund of withheld dividend tax on Danish shares (Appendix Q). It appears from the requests that the amounts were to be paid into the bank account of Goal Taxback Ltd. at NatWest Bank in England. The requests were accompanied by original Credit Advices (Tax Vouchers) issued by custodian ED&F Man.

On the basis of the requests, the Danish Tax Agency paid a total of DKK 21,060,000 to AIG via Goal Taxback Ltd.'s account in NatWest Bank, England, corresponding to a total (gross) dividend of DKK 78,000,000, see Appendix 1, p. 6.

The Danish Tax Agency's decision (Appendix 1, pp. 6-7) sets out the acquisition sums for AIG's purchase of the shares as shown in the submitted Credit Advices:

| Danish Tax Agency bundle | Share | Price date | Quantity | Rate | Estimated acquisition cost in DKK |
|---|---|---|---|---|---|
| 15614 | Coloplast AIS - B | 12/05/2013 | 500,000 | 358.30 | 179,150,000 |
| 19414 | TDC A/S | 03/06/2014 | 5,000,000 | 52.65 | 263,250,000 |
| 21814 | Danske Bank A/S | 03/18/2014 | 7,750,000 | 145.70 | 1,129,175,000 |
| 21814 | Novo Nordisk A/S B | 03/20/2014 | 3,500,000 | 245.80 | 860,300,000 |
| 27814 | A.P. Møller Maersk A/S B | 03/31/2014 | 1,000 | 65,000.00 | 65,000,000 |
| 27814 | Tryg A/S | 04/03/2014 | 50,000 | 551.50 | 27,575,000 |
| 72614 | TDC A/S | 08/07/2014 | 3,400,000 | 51.35 | 174,590,000 |
| 106214 | CHR. Hansen Holding A/S | 11/27/2014 | 800,000 | 258.90 | 207,120,000 |
| 109214 | Coloplast A/S - B | 12/04/2014 | 1,500,000 | 527.00 | 790,500,000 |
| 21315 | Novozymes A/S B | 02/252015 | 750,000 | 322.50 | 241,875,000 |
| 34815 | A.P. Møller Maersk A/S B | 03/30/2015 | 4,000 | 16,410.00 | 65,640,000 |

It is undocumented that AIG has actually made these alleged massive investments in Danish equities.

It is agreed that AIG is a "One-Participant Plan" (Supplementary Appendix, Section 1.3). As a result of this, in 2016 according to the IRS website, the annual contribution was limited to a maximum of $53,000, equivalent to $286,873 in 2013, $324,434 in 2014, and $361,990 in 2015, see Appendix 1, p. 10 with note 31 (or $59,000 if the participants age 55 or older).

The Form 5500 (Appendix U) filed by AIG with the IRS shows that AIG had the following assets at the end of fiscal years 2012-2014, see also Exhibit 1, p. 5:

| Calendar year: | USD according to FORM 5500 EZ / SF | DKK ex. rate EOY | Converted to DKK | Number of active participants |
|---|---|---|---|---|
| 2012 | 4,529,723 | 5.6591 | 25,634,155 | 1 |
| 2013 | 4,893,956 | 5.4127 | 26,489,516 | 1 |
| 2014 | 5,309,103 | 6.1214 | 32,499,143 | 1 |

It can therefore be concluded that AIG did not have the necessary capital to make the investments shown in the Credit Advices that were sent to the Danish Tax Agency, and on which AIG's dividend tax refund claims are based. In addition, it can be inferred from the submitted Form 5500-SF that AIG did not receive the alleged net dividends, cf. Appendix 1, p. 5, and section 6.2 below.

### 2.3    Pension plans represented by Lundgrens in the 1st wave of cases

For the 12 pension plans (including 10 US pension plans) represented by Lundgrens in the 1st wave of cases, 4 leading cases have been selected (SANST case no. 118-0006637). This submission deals with one of these cases.

**Table 1** below shows the *refunds* paid (DKK) to the 4 pension plans selected as leading cases.

Leading cases American Investment Group Of New York L.P. Pension Group (SANST case no. 18-0005426), Del Mar Asset Management Saving & Retirement Plan (SANST case no. 18-0005308) and Kamco LP Profit Sharing Pension Plan (SANST case no. 18-0005414) used ED&F Man as custodian, while Europa LLP Executive Pension Scheme (SANST case no. 18-0005431) used Salgado Capital. On this basis, the tables are structured as follows:

**Table 1: Refunds paid (DKK)**

| | | AMERICAN | DELMAR | KAMCO LP PROFIT | Total |
|---|---|---|---|---|---|
| 2013 | A P Møller Mærsk A/S - B | | 9,720,000.00 kr | | 9,720,000.00 kr |
| | Chr Hansen Holding A/S | | 1,250,748.00 kr | | 1,250,748,00 kr |
| | Coloplast A/S - B | 945,000.00 kr | 945,000.00 kr | | 1,890,000.00 kr |
| | Tryg A/S | | 10,530,000.00 kr | | 10,530,000.00 kr |
| 2014 | A.P. Møller Mærsk A/S - B | 378,000.00 kr | 4,538,000.00 kr | 1,890,000.00 kr | 8,804,000.00 kr |
| | Chr. Hansen Holding A/S | 814,320.00 kr | | | 814,320.00 kr |
| | Coloplast NS - B | 3,037,500.00 kr | 3,240,000.00 kr | | 8,277,500.00 kr |
| | Danske Bank A/S | 4,185,000.00 kr | | 3,982,500.00 kr | 8,167,500.00 kr |
| | Novo Nordisk A/S - B | 4,252,500.00 kr | | 5,348,000.00 kr | 12,757,500.00 kr |
| | Novozymes A/S - B | | 5,298,750.00 kr | | 5,298,750.00 kr |
| | TOC A/S | 4,347,000.00 kr | 14,256,000.00 kr | 4,094,858.72 kr | 22,897,858.72 kr |
| | Tryg A/S | 364,500.00 kr | 2,551,500.00 kr | | 2,916,000.00 kr |
| 2015 | A P Møller Maarsk A/S - B | 2,128,680.00 kr | | | 2,128,680.00 kr |
| | Novozymes A/S - B | 607,500.00 kr | | | 607,500.00 kr |
| Total | | 21,060,000.00 kr. | 55,488,998.00 kr. | 15,313,358.72 kr. | 91,860,354.72 kr. |

| | EUROPA | | | |
|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 |
| A.P. Møller Mærsk A/S - A | | | 705,600.00 kr | 9,460,800.00 kr |
| A.P. Møller Mærsk A/S - B | 2 160 000,00 kr | 250,560,000.00 kr | 1.461 600,00 kr | 23,652,000.00 kr |
| Carlsberg A/S - B | 660.000,00 kr | 669,600.00 kr | 1,056,000.00 kr | 1,404,000.00 kr |
| Chr. Hansen Holding A/S | 348,000.00 kr | 1,059,192.00 kr | 678,800.00 kr | |
| Coloplast A/S - B | 480,000.00 kr | 3,050,400.00 kr | 2,886,000.00 kr. | |
| Danske Bank A/S | | | 1,104,000.00 kr | 5,214,000.00 kr |
| DSV A/S | 216,000.00 kr | 24,450.000 kr | 504 OW W kr | 307,200.00 kr |
| FLsmidth & Co A/S | 540.000,00 kr | 885,600.00 kr | 168 000,00 kr | 280,800.00 kr |
| GN Store Nord A/S | | 299,880.00 kr | 23,184,000 kr | 194,400.00 kr |
| Lundbeck A/S | 209,400.00 kr | 408,000.00 kr | 29,918,000 kr | |
| NKT Holding A/S | | 364,800.00 kr | 12,600,000.00 kr | 72,000.00 kr |
| Novo Nordisk A/S - B | 3,696,000.00 kr | 5,097,800.00 kr | 1,080,000.00 kr | 12,000,000.00 kr |
| Novozymes A/S - B | 524,400.00 kr | 633,600.00 kr | 960,000.00 kr | 972,000.00 kr |
| Pandora A/S | | 409,200.00 kr | 1,014,000.00 kr | 1,820,000.00 kr |
| TDC A/S | 2,252,880.00 kr | 2,092,800.00 kr | 338,640.00 kr | 1,404,000.00 kr |
| Tryg A/S | | 530,400.00 kr | 972,000.00 kr | 522,000.00 kr |
| Vestas Wind Systems A/S | | | | 936,000.00 kr |
| Total | 104,010,252.00 kr. | | | |

The *alleged investments* (DKK) of the 4 pension plans on which the reimbursements are based are shown in table 2 below:

**Table 2: Alleged investments (DKK)**

| | | AMERICAN | DELMAR | KAMCO LP PROFIT | Total |
|---|---|---|---|---|---|
| 2013 | A P Møller Mærsk A/S - B | | 1,312,800,000.00 ke | | 1,312,800,000.00 kr |
| | Chr Hansen Holding A/S | | 150,960,000.00 kr | | 150,960,000.00 kr |
| | Coloplast A/S - B | 179,150,000.00 kr | 179,150,000.00 kr | | 358,300,000.00 kr |
| | Tryg A/S | | 721,350,000.00 kr | | 721,350,000.00 kr |
| 2014 | A.P. Møller Mærsk A/S - B | 65,000,000.00 kr | 780,000,000.00 kr | 325,000,000.00 kr | 1,170,000,000.00 kr |
| | Chr. Hansen Holding A/S | 207,120,000.00 kr | | | 207,120,000.00 kr |
| | Coloplast NS - B | 790,500,000.00 kr | 1,404,300,000.00 kr | | 2,194,800,000.00 ke |
| | Danske Bank A/S | 1,129,175,000.00 kr | | 1,074,537,500.00 kr | 2,203,712,500.00 kr |
| | Novo Nordisk A/S - B | 860,300,000.00 kr | 639,080,000.00 kr | 1,081,520,000.00 kr | 2,580,900,000.00 kr |
| | Novozymes A/S - B | | 1,993,900,000.00 kr | | 1,993,900,000.00 kr |
| | TOC A/S | 437,840,000.00 kr | 1,263,600,000.00 kr | 405,870,722.40 kr | 2,107,310,722.40 kr |
| | Tryg A/S | 27,575,000.00 kr | 193,025,000.00 kr | | 220,600,000.00 kr |
| 2015 | A P Møller Maarsk A/S - B | 65,640,000.00 kr | | | 65,640,000.00 kr |
| | Novozymes A/S - B | 241,875,000.00 kr | | | 241,875,000.00 kr |
| Total | | 4,004,175,000.00 kr. | 8,638,165,000.00 kr | 2,886,928,222.40 kr | 15,529,268,222.00 kr |

| | EUROPA | | | |
|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 |
| **A .P Møller Mærsk A/S – A** | | | 262,500,000.00 kr | 632,400,000.00 kr |
| A.P. Møller Mærsk A/S – B | 764,640,000.00 kr | 761,424,000.00 kr | 565,500,000.00 kr | 1,641,000,000.00 kr |
| **Carlsberg A/S – B** | **458,700,000.00 kr** | **535,680,000.00 kr** | **574,200,000.00 kr** | **742,950,000.00 kr** |
| Chr. Hansen Holding A/S | 188,000,000.00 kr | 287,640,000.00 kr | 388,350,000.00 kr | |
| **Coloplast A/S – B** | **278,000,000.00 kr** | **1,927,492,000.00 kr** | **2,007,870,000.00 kr** | |
| Danske Bank A/S | | | 670,220,000.00 kr | 1,384,870,000.00 kr |
| **DSV A/S** | **232,020,000.00 kr** | **234,068,000.00 kr** | **468,720,000.00 kr** | **30,720,000.00 kr** |
| FLSmidth & Co A/S | 195,800,000.00 kr | 284,622,000.00 kr | 191,240,000.00 kr | 81,640,000.00 kr |
| **GN Store Nord A/S** | | **535,500,000.00 kr** | **293,250,000.00 kr** | **277,560,000.00 kr** |
| Lundbeck A/S | 56,750,000.00 kr | 175,610,000.00 kr | 155,340,000.00 kr | |
| | | | | |
| **NKT Holding A/S** | | **86,222,000.00 kr** | **93,990,000.00 kr** | **66,780,000.00 kr** |
| Novo Nordisk A/S – B | 1,789,700,000.00 kr | 2,245,540,000.00 kr | 491,000,000.00 kr | 6,838,000,000.00 kr |
| **Novozymes A/S – B** | **381,800,000.00 kr** | **477,840,000.00 kr** | **812,800,000.00 kr** | **870,750,000.00 kr** |
| Pandora A/S | | 96,224,000.00 kr | 462,800,000.00 kr | 921,750,000.00 kr |
| **TDC A/S** | **352,800,000.00 kr** | **448,300,000.00 kr** | **873,145,000.00 kr** | **631,800,000.00 kr** |
| Tryg A/S | | 81,753,000.00 kr | 165,450,000.00 kr | 130,275,000.00 kr |
| **Vestas Wind Systems A/S** | | | | **580,400,000.00 kr** |
| Total | 86,504,025,000.00 kr | | | |

As the tables show, the pension plans claim to have made investments worth many *billion* DKK However, the pension plans have not provided any evidence as to how they have financed the alleged very substantial share purchases in Danish listed companies, cf. also below in section 6.3.

### 2.4    The pension plan did not own shares and did not receive dividends

In its submission of June 11, 2019, p. 6, the Pension Plan argues that the evidence submitted "clearly" proves that the Pension Plan acquired the shares, was the legal owner of the dividends paid and was therefore also entitled to recover the dividend tax withheld on the shares.

The actuality, however, is that the Pension Plan cannot prove that it paid for shares. Nor can the Pension Plan prove that it owned shares. It also cannot prove that it has received net dividends from the shares it claims to have owned. On the other hand, it is clear that the pension plan did not have enough money to make the alleged investments. The pension plan's equity was far from sufficient to make the alleged investments, and the pension plan has still not documented how it would have financed the massive share purchases.

In itself, it is very implausible that the pension plan buys large shareholdings without significant assets. This impression is considerably reinforced when there are also no cash flows to/from the pension plan's own (bank) accounts.

On this basis alone, the decision must be upheld, as the pension plan has not proven that it is entitled to a refund of the withheld dividend tax.

### 2.5    The alleged set-up of the pension plan is unclear and undocumented

It is noteworthy that the pension plan has failed to provide relevant material which it must have in its possession if, as the pension fund claims, a purchase of shares had taken place:

- The Pension Plan has only partially responded to the Danish Tax Agency's requests, cf. Section 7 below.
- No evidence of purchase and sale orders has been provided by the pension plan.
- No evidence has been provided that proves that the purchase and sales confirmations have been made available to the pension plan.
- No evidence of the funding of the pension plan has been provided.
- There is no evidence that the pension plan received the alleged net benefits.
- No documentation has been provided (in the form of bank statements) of cash flows to/from the pension plan bank accounts.

- No evidence has been provided of the pension plan's hedging of foreign exchange risk.
- No evidence was provided of ED&F Man's authority to trade billions worth of stocks on behalf of the pension plan.

The material presented is incoherent and the material and the Pension Plan's explanation leaves a lot of loose ends and gaps.

In essence, it is unclear what the story of the Pension Plan actually is; the pension plan knows remarkably little about what has happened in their own case.

Instead, the pension plan has come up with a series of incoherent explanations. When the explanations of the pension plan are compared with the material submitted by the pension plan during the preparation of the cases with the Danish Tax Agency, it becomes very clear that the pension plan has never owned Danish shares. On the contrary, the available information points to the complete opposite, cf. UfR 2003.2313/3H. The "documentation" is in fact incoherent and incomplete.

### 3.    Burden of proof

It is the pension plan that has requested the refund of withheld dividend tax, and it is thus also the pension plan that has the burden of proving that the conditions for refund of dividend tax are met, cf. e.g. UfR 2003.2312/3H.

It is irrelevant whether at the time of the request the pension plan submitted documents which, if they had been correct, were sufficient documentation according to the Danish Tax Agency's way of conducting things in 2013–2015. However, what is relevant, is whether on the basis of the information provided in this case, the Danish National Tax Tribunal finds that the pension plan has proven that it met the conditions for refund of dividend tax.

The pension plan's explanation of the transactions that should have entitled them to dividend distribution is implausible, see below, and the burden of proof is therefore even more important, cf. e.g. UfR 1998.898 H.

The pension plan, on the other hand, argues that the burden of proof has shifted so that the Danish Tax Agency is closer to the events, and therefore must bear the burden of proof (submission of June 11, 2019, p. 19).

The Tax Agency disputes that the burden of proof can be reversed in this way, even taking into account the nature of the cases.

Between March 2014 and April 2015, the pension plan requested refunds on the basis of very large alleged shareholdings. According to the Pension Plan, it has made investments of more than DKK 4 billion. The case was initiated by the issuance of the proposed decision on March 23, 2018, a few years after the payments – and at a time when accounting records should still be kept under both Danish and US law. Incidentally, it highlights that the pension plan can simply obtain the necessary documentation from ED&F Man. *If the* pension plan actually owned shares, that would be easy to show.

There is no doubt in the matter; there is no evidence of the alleged share deals. And there are far too many undocumented facts in the material the pension plan has presented to support their "story." The Danish National Tax Tribunal is of the opinion, that if there is any doubt in this case, it is solely because the pension plan fails to produce documents that *must* be in its possession. This is to the detriment of the pension plan.

The Pension Plan states the following in its submission dated June 11, 2019 (p. 3):

> "The Danish Tax Agency thus also acknowledges on page 17 that the statistics only show that <u>a proportion of</u> refund requests have been unjustified. The appellant cannot comment on the accuracy

*of the statement, but emphasizes that, on the other hand, the Danish Tax Agency acknowledges that part of the refunds has been paid correctly, cf. also point 2 below."*

The latter is not correct. The fact that the figures support *"that a large proportion of refund requests have been unjustified,"* see the Danish Tax Agency's 1st submission of September 27, 2018, p. 17, two last paragraphs, does not mean that the Danish Tax Agency recognizes that the remaining proportion of refund requests must be *justified.* This is an erroneous conclusion.

### 4.    Documentation from ED&F Man has no evidential value

The pension plan attaches great weight to the fact that the alleged share purchases were made through ED&F Man. In its Statement of opposition dated August 03, 2018 (p. 2) the Pension Plan describes ED&F Man as

*"a large and reputable global financial brokerage firm, authorized and regulated by the Financial Conduct Authority ("FCA")."*

In its submission of June 11, 2019, p. 4, the pension plan highlights that it has not used any of the 4 custodians controlled by Sanjay Shah (Solo Capital, Old Park Lane, Telesto and West Point) and that the Danish Tax Agency's comments regarding these custodians are

*"quite irrelevant to the present case and is yet another example of the Danish Tax Agency's deliberate attempt to make the appellant's case subject to facts which do not apply to the appellant and which are consequently completely irrelevant to the appellant."*

The Pension Plan also states in its submission of June 11,  2019, p. 20, that ED&F Man is not sued as a "fraud-defendant" in England, but only as a "non-fraud-defendant"

*"which means that the Danish Tax Agency does not claim that ED&F had knowledge of or participated in the alleged fraud."*

The pension plan's comments must be understood as meaning that the use of ED&F Man as broker and custodian distinguishes this case in a decisive way from the group of cases concerning fraud involving the refund of withheld dividend tax. When ED&F Man has been involved, everything has -- according to the pension plan -- been done in a neat and orderly manner.

If there were a difference in the cases where pension plans used Shah-controlled custodians versus ED&F Man, one would think that the Pension Plans' documentation would be complete and satisfactory in the cases where ED&F Man was involved. If ED&F Man is regulated by the FCA, one would expect the documentation to be flawless and in general top notch.

In addition, one would expect a pension plan with a modest capital base that buys shares for several billion DKK to keep documentation of these share purchases. Not for tax purposes, but for its *own sake* – to ensure *it has* evidence of ownership of the shares.

It was also to be expected that such a pension plan would be willing to provide information - especially when both the Danish Tax Agency and the Danish Tax Appeals Board, both explicitly request additional information.

However, as can be seen from the documentation, the Pension Plan cannot provide evidence of having owned the alleged shares and the Pension Plan – despite being requested to do so – continues to fail to provide material that it *must* have in its possession, including its own bank statements and the basis of the agreement for the cooperation with ED&F Man, see also the Danish Tax Agency's ruling, p. 2, 4th paragraph.

The most important matter in the case, regardless of whether the custodian is Shah-controlled or ED&F Man, is that there is no evidence that the Pension Plan owned the shares that formed the basis of the refunds paid.

And it goes without saying that it is not proof of ownership that ED&F Man has acted as custodian (and/or broker).

In addition, there are several factors which, when examined together as well as separately, show that the ED&F Man documentation cannot be given any evidential weight, see below paragraphs 4.1–4.6 and paragraph 5. This is the case, among other things, as a result of the admission by ED&F Man that it has contributed to the unjustified payment of approximately DKK 184 million, cf. section 4.1 below.

**4.1      ED&F Man has admitted to filing wrong Tax Vouchers for about 184 million DKK.**
First of all, ED&F Man has admitted to having issued a total of 89 incorrect Tax Vouchers, which have formed the basis for unjustified refunds totaling approximately DKK 184 million out of the total of approximately DKK 582 million for which ED&F Man has issued Tax Vouchers. This is a very significant proportion of the Tax Vouchers issued by ED&F Man which have now been recognized as incorrect long after the proceedings in England.

In its Defense dated December 13, 2018 (**Appendix AI**, p. 19 (paragraph 38.3)) with "Appendix A - incorrect Tax Vouchers" (**Appendix AJ**), ED&F Man has thus admitted that 9 issued Tax Vouchers were incorrect, which led to unjustified payments of refund for a total of DKK 312,120.

In addition, ED&F Man in its Amended Defense dated September 05, 2019 with "Appendix E - incorrect Tax Vouchers (2)" (**Appendix AK**, p. 3 (paragraph 4.2) and pp. 33-41) has admitted that an additional 80 issued Tax Vouchers were incorrect, which has led to total unjustified payment of DKK 183,902,399.

Despite the fact that ED&F Man is *"a large and reputable global financial brokerage firm, authorized and regulated by the Financial Conduct Authority ("FCA")",* as stated in the Pension Plan's Statement of Opposition dated August 03, 2018 (p. 2), ED&F Man has still contributed to the *unjustified* payment of a total of DKK 184,214,519 in refunds.

The incorrect Tax Vouchers from ED&F Man have led to, among other things, the following *recognized as incorrect* refunds to US pension plans represented by the Law Firm Lundgrens:

| Pension Plan | SANST case no. | Refund paid (DKK) | Recognized unjustified refunds (DKK) |
|---|---|---|---|
| American Investment Group | 18-0005426 (leading case) | 21,060,000 | 8,613,000 |
| Del Mar Asset | 18-0005308 (leading case) | 55,486,998 | 33,986,250 |
| DW Construction | 18-0005398 | 13,603,950 | 11,011,950 |
| Federated Logistics | 18-0005295 | 32,265,000 | 31,455,000 |
| Kamco Investments | 18-0005423 | 10,496,991 | 6,102,000 |
| Kamco LP | 18-0005414 (leading case) | 15,313,357 | 11,313,000 |
| Linden Associates | 18-0005422 | 13,168,508 | 7,416,225 |
| Moira Associates | 18-0005427 | 16,989,750 | 10,813,500 |
| Newsong Fellowship Church | 18-0006919 | 4,245,750 | 4,245,750 |
| Riverside Associates | 18-0005368 | 12,724,425 | 7,416,225 |
| The Goldstein Law Group | 18-0005425 | 9,521,280 | 5,107,050 |

It has therefore been established that ED&F Man has certified the ownership of Danish shares by pension plans through the means of incorrect Tax Vouchers, which have formed the basis for wrongful payments of refunds to the pension plans for a total of approximately DKK 184 million. This by itself means that documentation from ED&F Man cannot

be given any evidential value whatsoever in relation to the alleged ownership of the pension plan. On the contrary, the admission and the pension plan's support of ED&F Man create a very clear presumption that all ED&F Man Tax Vouchers are incorrect. As a result of this, a very heavy burden of proof then rests on the Pension Plan to be entitled to a refund. This burden of proof has not been met by the pension plan.

However, the admittedly incorrect Tax Vouchers are not the only reason why documentation from ED&F Man cannot be attributed any evidential value. Indeed, *in addition* to the admittedly incorrect Tax Vouchers ED&F Man has *in other cases* constructed documentation of "share transactions" and certified ownership even though these were not based on factual evidence, see sections 5.1 and 5.2 below for more information.

As with the Shah-controlled custodians, it is apparently ED&F Man who has orchestrated the "deals" on behalf of the Pension Plan. Indeed, another pension plan in the group of cases has stated in one of the civil damage actions in the US that it was ED&F Man who arranged and executed all transactions (**Appendix AC**, page 11). The same seems to be true for this Pension Plan.

ED&F Man has decided to close its *UK equity finance business* at the end of March 2019, see **Appendix AD**.

### 4.2     ED&F Man specific error 1: Improper currency conversion
The Danish Tax Agency has found that the supporting documentation from the Pension Plan's custodian, ED&F Man, is in many places significantly inaccurate. For an illustration of this, see Appendix X.

Appendix X is an account from another pension plan that - like AIG - uses ED&F Man as its custodian. The account contains a futures position which as of April 11, 2013 has a value of DKK 6,030,486 (Trade Date Amount). As the account is held in Euro (EUR), the value of the futures position is converted into EUR. The conversion is shown on the top line under "Cash Summary", see extract below.

## Cash Summary

| Cur Layer | Trade Date Amount | Conv Rate | TD Reporting Amt (EUR) |
|---|---|---|---|
| DKK Var Margin | 6,030,486.00 Cr | 7.45610000 | 44,963,906.66 Cr |
| | | | 44,963,906.66 Cr |

As can be seen, the value of the futures position of DKK 6,030,486 is converted into EUR 44,963,906.66 by multiplying by the exchange rate of 7.4561. However, when converting from DKK to EUR, the amount should obviously have been *divided* by the exchange rate. This obvious error makes the value of the futures position much higher than it really is. If the amount had been converted correctly, the future position would have had a value of EUR 808,798.97. ED&F has therefore registered the future position with a value which is approximately 55 times higher than the real value of the future position. As a result of this error, the Total Account Value is precisely EUR 44,963,906.66, cf. Appendix X, p. 2. This is a calculation error of over EUR 330 million.

It makes no sense that custodian would make such a mistake. The documents from the custodian allegedly concern investments of many million DKK in many different Danish companies. The amounts involved are therefore very large. This will of course require an IT system that does not make mistakes.

An error of that nature in supporting documentation from the Pension Plan's custodian, ED&F Man, is in itself discrediting.

### 4.3    ED&F Man specific error 2: Shareholding

ED&F Man, has in another of the cases within the dividend case group, issued documentation to a pension plan for ownership of 50,000 shares of IC Company A/S (Appendix Y). As shown in the attachment, the Ex date was September 25, 2014.

The Danish Tax Agency is in possession of the custodial account statement for the account in which ED&F Man apparently held this shareholding (Appendix Z). As shown therein, ED&F Man acquired 5,000 shares from Jefferies International Ltd. on September 19, 2014, which were delivered on September 26, 2014. The shares were "traded" at DKK 0, which strongly suggests that this was a stock loan. For these shares, ED&F Man was paid dividends to its account. On September 29, 2014, ED&F Man transferred 5,000 shares to Jefferies International Ltd. for DKK 0, suggesting that this was a return of the above-mentioned shareholding. The delivery took place on September 30, 2014.

In addition, it appears that ED&F Man acquired 10 x 5,000 shares on September 24, 2014, which were delivered on September 30, 2014 (T + 4). ED&F Man sold 10 x 5,000 shares on September 25, 2014, and delivered the shares on September 30, 2014 (T + 3). The shares were thus delivered under the purchase agreement on the same day as they were to be delivered under the sale agreement. As a result of this, on September 30, 2014, ED&F Man received 50,000 shares and delivered them on the same day. In other words, the shares merely "touched" ED&F Man's account.

The shares were acquired at DKK 167.5 each and sold at DKK 165.5 each. The loss was thus DKK 2.00 per share. For 50,000 shares, the loss on purchase/sale was therefore exactly DKK 100,000.00.

ED&F Man has thus borrowed 5,000 shares, according to the custodial account statement. In addition, ED&F Man "purchased" 50,000 shares on the 24th, which were sold on the 25th, the purchase and sale being completed on the same date and for perfectly rounded amounts.

Overall, there is *no* evidence that ED&F Man would have owned any of these shareholdings. On the contrary, the documents show how ED&F Man attempted to make it appear, through trades in/out of custody, that it held shares on behalf of pension plans. Yet ED&F Man certified ownership of the shares. And as a result of this, that documentation cannot be given any evidential value.

### 4.4    ED&F Man specific error 3: Inconsistency between share purchases and Credit Advices

For another pension plan in the group of cases, which – like AIG – uses ED&F Man as custodian, the Danish Tax Agency has found discrepancies between the share items used for reimbursement and the shareholdings according to the Account Statements (**Appendix AE**, p. 1–2) and the General Ledger (Appendix AE, p. 3) provided. This does not make sense, as the Account Statements and the General Ledger should reflect the Pension Plan's shareholdings and therefore the shareholdings for which the Pension Plan is seeking a refund of withheld dividend tax.

On September 07, 2012, the pension plan requested a refund of dividend tax on 375,000 TDC shares - (Appendix AE, p. 4).

The ex-date was August 09, 2012, and the Pension Plan must therefore prove, among other things, that it owned 375,000 shares during this period.

According to Appendix AE, page 3, the Pension Plan had purchased 1.4 million TDC shares for DKK 41,1405 each, which were delivered on August 09, 2012.

However, there is no explanation as to why the pension plan should have bought 1,400,000 TDC shares and "only" requested a refund for 375,000 shares. On this basis, the inconsistency shows that the ED&F Man documentation is inconsistent and therefore cannot be relied upon.

**4.5      Share purchase: terms of settlement not in line with market**

Until October 06, 2014, the standard for share trades in Denmark was that shares were delivered three days after the contract was entered into (i.e., settlement T+3). After October 06, 2014, the standard was delivery after two days (i.e., T+2) (Appendix W). Only business days are included in the calculation of delivery time – i.e., weekends and public holidays are not included.

The pension plan's share transactions are settled as follows, see Appendix 5A, 6A, 7A, 7D, 8A, 8C, 9A, 9D, 10A, 10D, 11A, 12A, 13A, 13D, 14A, 14D:

|  | Purchase (settlement) | Sale (settlement) |
|---|---|---|
| Coloplast | 12/05/2013 (T+4) |  |
| TDC | 03/05/2014 (T+3) |  |
|  | 03/06/2014 (T+4) |  |
|  | 03/06/2014 (T+4) |  |
| Danske Bank | 03/18/2014 (T+4) | 06/10/2014 (T+3) |
|  | 03/17/2014 (T+3) |  |
|  | 03/18/2014 (T+4) |  |
| Novo Nordisk | 03/20/2014 (T+4) | 06/10/2014 (T+3) |
| Maersk-B | 03/28/2014 (T+3) | 06/10/2014 (T+3) |
| Tryg | 04/02/2014 (T+3) | 06/10/2014 (T+3) |
| TDC | 08/07/2014 (T+2) |  |
| Chr. Hansen Holding | 11/27/2014 (T+2) |  |
| Coloplast | 12/03/2014 (T+2) | 12/10/2014 (T+2) |
| Novozymes | 02/25/2015 (T+3) | 02/26/2015 (T+2) |

The Danish Tax Agency makes reference to the Supplementary Appendix, Section 6, for a comprehensive summary of stock trades for pension plans represented by the Lundgrens – in the 1st wave of appeals of the group of cases – using ED&F Man as their custodian.

As can be seen from the Supplementary Appendix, section 6, in many cases the settlement of purchases has not taken place on market terms (T+3 until October 06, 2014, and T+2 thereafter), but with a delivery time one day longer than the market standard. The pension plans have not explained this. It is also not known why several of the pension plans sold their shares in the same companies on the same day (June 10, 2014), but this suggests that the "trades" were orchestrated from a central level.

The deviation from market conditions is noteworthy, as the deviation, even if there had been share transactions and not just accounting entries, makes it very difficult to verify. This is due to the "timing" of distributions on the Danish market:

A company decides to make a distribution at its general meeting. According to the market conditions for delivery, the day of the general meeting will be considered as "day 0." Once a company has decided to make a distribution, the ex date (ex dividend date) is determined. The ex date is the first day after the general meeting on which the shares are traded without dividend and will therefore be considered as "day 1."

Then the record date is set. The date is determined by the trading platform based on the market conditions for the delivery of shares. Those who are registered as custodial account holders on that date (record date) will receive the dividend. In case of delivery T+2, the record date will be considered as "day 2." For delivery T+3, the record date will be considered as "day 3."

Prior to October 06, 2014, the market standard was T+3 delivery. This meant that if you acquired shares on Monday August 11, 2014, you would receive the shares (be registered as

owner) on Thursday August 14, 2014. Shares therefore had to be acquired three days before the record date if one was to be registered as an owner on the record date. In fact, trading two days before the record date would mean that, under normal delivery conditions (T+3), the shares would not be received before the company determined the ownership structure for the payment of the dividend, and thus the seller would receive the dividend. The ex date was therefore two days before the record date.

Therefore, to be entitled to dividends, shares had to be acquired <u>at least</u> three days before the record date. Thus, according to the market standard (T+3), one would receive the shares and be registered as an owner at the time when the distributing company determines the ownership, and one would receive the dividend.

On October 06, 2014, the market standard was changed to T+2 delivery. This means that the ex date became the day before the record date – i.e., one day closer to the record date due to the shortened delivery time.

However, in purchasing shares, the Pension Plan has deviated from the market standard in several cases, see above. Therefore, in these cases, the Pension Plan did not receive the dividend directly from the distributing company or through its own sub-custodians, this is even evident from their own agreements. The alleged dividends, on the other hand, were paid to a seller who was a custodian on the record date but who had obligation to continue the distribution, since according to the Pension Plan the share had been sold including the dividend (before the ex date).

The pension plan thus claims to have been the owner, even though it was not registered as owner on the record date, since it acted on terms that deviated from market standards. This is a set-up that makes verification very difficult, as the pension plans, according to their own company records, will not even be registered as the owner of the share on the record date, on which the company records the owners and pays the dividend. Because the Pension Plan claims that it receives the shares at a later date and that they are entitled to the dividend, that their seller receives. This situation increases the burden of proof on the side of the pension plan.

**4.6 Several of the alleged share trades were made through a coffee company**
Two of the purchase confirmations provided (Appendix 6a, pages 1 and 3) are a "Cash Equity Confirmation" issued by Volcafe.

It is noteworthy that these purchase confirmations concerning the purchase of shares for a total of approximately DKK 157 million do not specify the year these purchases were made.

Volcafe, which issued these purchase confirmations, is located in Switzerland and, according to its website (www.volcafe.ch), is a coffee company belonging to ED&F Man (Appendix AE).

No details have been given as to why these 2 share purchases were made by a coffee company. According to the Swiss company register (*Zefix - Zentraler Firmenindex*), Volcafe has the following for objectives, see Appendix Ø:

> «Zweck:
> *Die Gesellschaft bezweckt die Durchführung von Import-, Export-, Transithandels- und Kommissionsgeschäften mit Waren aller Art, vornehmlich mit Kaffee, in der Schweiz sowie im Ausland. Die Gesellschaft kann Zweigniederlassungen und Tochtergesellschaften im In- und Ausland errichten und sich an anderen Unternehmen im In- und Ausland beteiligen. Die Gesellschaft kann Grundstücke und Immaterialgüterrechte im In- und Ausland erwerben, halten, verwalten, verwerten und veräußern. Die Gesellschaft kann alle kommerziellen, finanziellen und anderen Tätigkeiten ausüben, die geeignet erscheinen, den Zweck der Gesellschaft zu fördern, oder die mit diesem zusammenhängen.*»

The text above can "roughly" be translated as follows:

> *"Purpose:*
> *The purpose of the company is to carry out import, export, transit trade and commission business in goods of all kinds, primarily coffee, in Switzerland and abroad. The Company may establish branches and subsidiaries in Switzerland and abroad and acquire interests in other companies in Switzerland and abroad. The Company may acquire, hold, manage, exploit and sell real estate and intangible property rights in Switzerland and abroad. The Company may engage in all commercial, financial and other activities which appear suitable to promote the purpose of the Company or which are related thereto."*

As can be seen above, brokerage is not even mentioned of the company's purpose statement.

**5.      The methodology of ED&F Man shows that there has been a form of creative accounting**

The Danish Tax Agency has obtained information on three ED&F Man deposits registered with SEB. The information includes shareholdings, dividends received and account movements (cash flows).

The information on ED&F Man's holdings can be compared to other pension plans' information on purchases and sales of shares, as well as those pension plans' information on claimed dividends.

It cannot be excluded that ED&F Man has additional shareholdings. However, the Danish Tax Agency has based their decisions on cases where the information from ED&F Man's deposits exactly matches the pension plan's information. On this basis, it must therefore be assumed that it is precisely these deposits that are linked to the pension plans' alleged investments.

The documents submitted by the pension plans to the Danish Tax Agency <u>do not</u> reflect the actual situation. On the contrary, the "documentation" issued by ED&F Man cannot be given any be evidential significance.

Indeed, the review shows that ED&F Man has constructed documentation for share transactions and that ED&F Man has certified ownership that is contradictory to the facts, see sections 5.1 and 5.2 below. Together with the admission during the English trial that ED&F Man has issued erroneous Tax Vouchers, the information shows that ED&F Man must have done so systematically.

When, in just one case, the ownership documentation issued by ED&F Man is found to be contrived and incorrect, the result is that the ED&F Man documentation cannot be relied upon in any of the cases. And the Danish Tax Agency's review has revealed significant errors in the ED&F Man documentation for several trades across the pension plans in the caseload.

In addition, as mentioned above, ED&F Man has admitted to having issued 89 incorrect Tax Vouchers, which formed the basis for unjustified refunds totaling approximately DKK 184 million, as described above in section 4.1. These admittedly incorrect Tax Vouchers <u>do not</u> include the constructed transactions documented and discussed in sections 5.1 and 5.2 below. The "documentation" from ED&F Man is therefore incorrect to a greater extent than the 89 acknowledged incorrect Tax Vouchers.

This means that "documentation" produced by ED&F Man is worthless in evidentiary terms. It also means that where there has been a need to construct incorrect 'documentation', this, taken in conjunction with ED&F Man's admission, as set out in section 4.1, clearly shows that no trading has taken place. As a result of this, it can therefore not be assumed that ED&F Man has "traded" shares on behalf of the pension plan, cf. also the Danish Tax Agency's ruling, p. 2, 4th paragraph.

**5.1 Chr. Hansen shares - 2014**

The overall process, as described in detail below, shows:

> that ED&F Man borrows shares
> ED&F Man "sells" the borrowed shares to another ED&F Man account
> ED&F Man "buys back" the borrowed (and "sold") shares from the same ED&F Man account two minutes later, and
> the shares borrowed are returned to the share lender after payment of dividends.

The transactions in bullets 2 and 3 are quite closely related.

Yet AIG uses documents from Transaction No. 3 to "document" a purchase (Section 5.1.1, below). However, those documents are without any connection to reality. After all, no shares were purchased by the pension plan (or on behalf of the pension plan). Rather, ED&F Man "sold" and immediately "repurchased" shares internally, thereby constructing purchase documentation (without any reality) that the pension plan uses as the basis for its claim to have purchased and owned shares.

### 5.1.1    *ED&F Man documentation for purchase is contrived and of no probative value*

The appellant, AIG, alleges that the pension plan acquired 800,000 Chr. Hansen shares on November 27, 2014 with delivery (settlement/value date) on December 01, 2014 (Appendix Å1). The price was DKK 207,122,592.

As evidence of the acquisition, AIG has provided

> a "confirmation from ED&F Man", which is an internal ED&F Man email from Paul Schofield to Sara Mina (Appendix Å1, p. 2)
> an account statement from ED&F Man ("Account Equity") in the name of the pension plan where the trade is posted (Appendix Å1, p. 3); and
> a SWIFT notification showing the completion of the payment (Appendix Å1, p. 4).

ED&F Man has also issued a Tax Voucher stating that AIG owned 800,000 Chr. Hansen shares beyond the dividend date (ex-date was November 28, 2014) (Appendix Å1, p. 5).

The Danish Tax Agency has verified this information in relation to ED&F Man's dealings with Chr. Hansen shares. The review has revealed that there is no reality behind the documents provided by the pension plan, as the "purchase" is contrived.

As Appendix Å2, a redacted extract of all Chr. Hansen transactions on ED&F Man's accounts is attached with the Danish Tax Agency's highlights. The appendix shows that ED&F Man did indeed "purchase" 800,000 Chr. Hansen shares on November 27, 2014, with delivery on December 01, 2014, for DKK 207,122,592. Meanwhile, the shares had been "sold" on the same day to another contracting party for DKK 207,120,000, in other words DKK 2,592 less (Appendix Å2, p. 1, deposit no. 05295142806):

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 12/01/2014 | SEB, acc. ED&F Man Capital Markets Limited | 11/27/2014 | Buy | 800,000.00 | -207,122,592.00 |
| 12/01/2014 | SEB, acc. ED&F Man Capital Markets Limited | 11/27/2014 | Sale | -800.000.00 | 207,120,000.00 |

As can be seen, the counterparty to the transactions is another account registered in the name of ED&F Man.

A review of the related Cash Account (excerpt provided as Appendix Å3) actually shows that - at least at the time of delivery - the shares were correctly sold and then bought back two minutes later (my presentation of the information):

| [SALE] | at 05.12 AM | Securities sale 207,120,000.00 CR |
| [BUY] | at 05.14 AM | Securities buy 207,122,592.00 DR |

This shows that ED&F Man did not buy 800,000 shares for AIG for DKK 207,122,592. Instead, ED&F Man moved 800,000 borrowed shares back and forth between two internal accounts, thereby constructing an account movement of shares and a cash flow. In other words, ED&F Man constructed a "purchase" by "selling" the borrowed shares to itself and then immediately "buying back" the shares from itself. The documentation for the "repurchase" is the documents AIG has provided as evidence of having purchased and owned shares.

The purchase is thus contrived and without substance.  The documents (Appendix Å1) do not show a share purchase – but merely that 800,000 shares have been moved back and forth. And the payments almost look like a "fee" of DKK 2,592 (the difference in the two trades) has been paid for the "inconvenience." The trades alone have resulted in a *minimal* liquidity move of DKK 2,592.

### 5.1.2    ED&F has certified their ownership contrary to the actual facts

ED&F Ownership of Chr. Hansen shares beyond the dividend date (ex-date of November 28, 2014) for five pension plans:

| Shareholder (Pension Plan) | Claimed withheld dividend tax | Share | Number of shares | Ex-date |
|---|---|---|---|---|
| American Investment Group Of New York, L.P. Pension Plan | 814,320.00 DKK | Chr. Hansen Holding A/S | 800.000 | 11/28/2014 |
|  | 834,678.00 DKK | Chr. Hansen Holding A/S | 820.000 | 11/28/2014 |
|  | 834,678.00 DKK | Chr. Hansen Holding A/S | 820.000 | 11/28/2014 |
|  | 834,678.00 DKK | Chr. Hansen Holding A/S | 820.000 | 11/28/2014 |
|  | 834,678.00 DKK | Chr. Hansen Holding A/S | 820.000 | 11/28/2014 |

ED&F Man has thus certified ownership of a total of 4,080,000 shares over the dividend period. This corresponds exactly to the number of shares that ED&F Man held in its share deposit over and above the exchange date (Appendix Å2, p. 1).

The Danish Tax Agency has carried out a detailed examination of ED&F Man's deposit. The audit shows that 800,000 of the shares in the deposit were acquired for DKK 0 (Appendix Å2, p. 1):

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 11/28/2014 | Morgan Stanley International Ltd | 11/24/2014 | Buy | 300,000.00 | 0.00 |
| 11/28/2014 | Morgan Stanley International Ltd | 11/21/2014 | Buy | 250,000.00 | 0.00 |
| 11/28/2014 | Morgan Stanley International Ltd | 11/21/2014 | Buy | 250,000.00 | 0.00 |

When the shares are acquired for 0 DKK, it *probably means that* the shares are *borrowed*. It *could* also be the return of borrowed shares, but this is not the case here, as no loans have previously been made by Chr. Hansen shares from the account.

So ED&F Man has borrowed 800,000 shares. It is not clear whether ED&F Man is borrowing the shares on behalf of a particular pension plan or on behalf of other clients or on its own behalf.

The shares are returned immediately after the dividend date in the same way without payment and to the same counterparty:

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 12/02/2014 | Morgan Stanley International Ltd | 12/01/2014 | Sale | -300,000.00 | 0.00 |
| 12/02/2014 | Morgan Stanley International Ltd | 12/01/2014 | Sale | -250,000.00 | 0.00 |
| 12/02/2014 | Morgan Stanley International Ltd | 12/01/2014 | Sale | -250,000.00 | 0.00 |

ED&F Man has *borrowed at* least 800,000 shares. No information is available as to whether the other 3,280,000 shares *are actually* held by (other) ED&F Man customers or whether they are also borrowed shares, with the loan merely masked further. In any event, the Danish Tax Agency notes that ED&F Man has not registered Chr. Hansen shares in its possession other than during the period from November 28, 2014 to December 08, 2014.

No dividend refund can be claimed for borrowed shares - because the refund belongs to the owner (lender), not the borrower.

*Yet* ED&F Man has certified ownership of 4,080,000 shares – and thus *at least* 800,000 borrowed shares. ED&F Man has thus certified *ownership* – on a Tax voucher - of *borrowed* shares. ED&F Man has *known* that this could be used to reclaim withheld dividend tax - even though there is no right to do so for borrowed shares.

When ED&F Man issues documentation that is contrary to the true facts in just one case, this means that the Danish Tax Agency cannot rely on documentation from ED&F Man. Because it is uncertain whether the documentation corresponds to the actual ownership. And, as the following paragraphs will show, in many cases ED&F Man's documentation has been found to be inaccurate and/or misleading.

The 800,000 shares borrowed correspond exactly to AIG's alleged shareholding. It thus *appears that* it is AIG's shareholding that has been borrowed from Morgan Stanley International Ltd.

### 5.1.3 Has ED&F Man tried to mask the facts?
In other words, what has been done is that ED&F Man has borrowed some shares (section 5.1.2, above). It may be for the pension plan, but it doesn't have to be. A share borrower is not entitled to a dividend refund. The pension plan does not obtain evidence of ownership by the fact that ED&F Man has borrowed some shares.

Proof of ownership is obtained by ED&F Man selling the borrowed shares to an internal account. Two minutes later, the shares are sold back to ED&F Man's first account. The last trade is used to prove that the pension plan is the owner of the shares.

The arrangement shows that ED&F Man is aware that share borrowers are not entitled to dividend distribution, otherwise buying and selling back within two minutes would not be necessary.

The process also shows the dubious nature when the second and third transactions can serve no other purpose than to mask the real facts. The pension plan is the highest but it is also not documented the borrower of stocks. And it is undisputed that the borrower is not entitled to reimbursement.

In addition, ED&F Man fully manages the "trades" including hedging and funding on behalf of the pension plans (see section 6.4). It is thus – apparently – ED&F Man that controls this entire set-up and then documents ownership contrary to the facts. This significantly tightens the documentation requirements for pension plan shareholdings.

This has significant commonalities with the pattern of changing the numbers and unrealistic trades seen in the cases where pension plans have used custodians from the Solo group controlled by Sanjay Shah.

**5.2    TDC shares - 2014**

With regard to the TDC shares in 2014, it may - as was the case for Chr. Hansen shares in 2014 – be observed that internal "purchases/sales" of shareholdings were made in order to construct a "purchase" with trade notes and SWIFT with splits, which the pension plan presents as proof that shares were traded, but which are without factual basis and which do not correspond to the underlying facts.

In the case of TDC shares, too, it can be seen that shares have *been borrowed* beyond the dividend date, and the purpose of the internal 'trades' thus appears to be solely to mask the fact that the shareholdings are borrowed and that there is thus no entitlement to dividend distribution.

In addition, for the TDC shares, a "sale" of shares has also been constructed and a pension plan claims to have owned TDC shares at a time when there were no TDC shares in ED&F Man's deposits. Yet the pension plan provides ED&F Man documents to support this claim:

In one of the other lead cases, Kamco LP Profit Sharing Pension Plan (SANST case no. 18-0005414) ("Kamco"), the pension plan (which is also represented by Lundgrens) claims to have owned 2,901,000 TDC shares from August 07, 2014 to September 22, 2016 – i.e., for over two years – and has submitted "documentation" from ED&F Man to this effect.

The Danish Tax Agency has verified the documentation and it can be concluded that it is contrived and in no way proves that ED&F, let alone Kamco, would have owned the shares to which the 'documentation' relates.

> At the time of the pension plan "purchase", ED&F Man had borrowed TDC shares in its custodial account. ED&F Man's "purchase" on behalf of the pension plan is constructed by "selling"/"buying" shares internally between two ED&F Man accounts.
> For long periods from the pension plan's "purchase" to the "sale", ED&F Man had no TDC shares at all in its custodial accounts. In other words, the pension plan could not have owned the alleged shares.
> At the time of the pension plan "sale," ED&F Man had only borrowed shares in its custodial accounts. That means, that the pension plan could not have owned the shares it claims to have "sold."
> The "sale" is constructed by "selling"/"buying" shares internally between two ED&F Man accounts.

A redacted extract of all TDC transactions on ED&F Man's accounts is provided as Appendix AA1. On the attachment it is highlighted in yellow where the account "goes to 0" for a period of time, i.e. where there are *no* TDC shares remaining in the ED&F Man's deposits.

In light of the large number of transactions, the Danish Tax Agency has prepared some auxiliary appendices (Appendix AA2 and Appendix AA3) with extracts from this appendix to highlight certain facts.

### 5.2.1    ED&F Man documentation for purchase is contrived and of no probative value

Kamco claims to have purchased 2,901,000 TDC shares on August 07, 2014, for DKK 150,273,685.65. To document this, Kamco has submitted a purchase order from ED&F (Appendix AA4, p. 2).

The Danish Tax Agency has checked this information in relation to ED&F Man's deposits. In this context, the Danish Tax Agency has found the following transactions on the three ED&F Man accounts (Appendix AA1), where precisely 2,901,000 TDC shares were traded on August 07, 2014:

**Account 05295142806**

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Buy | 2,901,000.00 | 0.00 |

**Account 05295142814**

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Buy | 2,901,000.00 | -150.273.685.65 |
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Sale | -2,901,000.00 | 0.00 |
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Sale | -2,901,000.00 | 150.271.800.00 |

**Account 05295142822**

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Sale | -2,901,000.00 | 150,273,685.65 |
| 08/11/2014 | SEB, acc. ED&F Man Capital Markets Limited | 08/07/2014 | Buy | 2,901,000.00 | -150,271,800.00 |

The transaction highlighted in yellow matches the transaction for which Kamco has provided a SWIFT notification and trade note for.

However, the transaction does not constitute a share deal. As can be seen, the transactions are carried out with ED&F Man itself as "counterparty". And the shares are "sold back" for DKK 150,271,800. The price difference of DKK 1,885.65 looks almost like a "fee" for the inconvenience. And the transactions ("purchase"/"sale") are carried out at two-minute intervals (Appendix AA5).

As was the case with Chr. Hansen shares (section 5.1.1, above), ED&F Man has thus constructed the "acquisition." 2,901,000 TDC shares have not been purchased (on behalf of the pension plan). Shares have simply been moved back and forth between two internal ED&F Man accounts in order to produce "documentation."

However, the statement of account (Appendix AA1, see for example p. 1) shows that shares have been borrowed in a large number of cases. The back-and-forth internal transactions thus look like an attempt to mask the actual holdings so that a dividend refund can be requested even though the shares are actually borrowed.

### 5.2.2    ED&F Man documentation for ownership and sale is contrived and contrary to fact

Kamco has referred to Appendix AA4, p. 5, where it appears that the 2,901,000 TDC shares were sold on September 22, 2016, for DKK 115,401,780 and that the sale was completed on September 23, 2016.

Thus, according to the 'documentation' provided, the pension plan has owned the shares for more than two years.

This is in no way consistent with the fact that the ED&F Man accounts have not held a single TDC share for long periods of time. In particular, no TDC shares were held in the accounts during the following periods (Appendix AA2):

> September 20, 2014 to November 16, 2014
> November 25, 2014 to March 03, 2015
> March 20, 2015 to August 05, 2015
> August 26, 2015 to December 15, 2015
> December 22, 2015 to September 22, 2016

As a result of this, Kamco cannot have held TDC shares from August 07, 2014 to September 22, 2016. As can be seen, during most of the alleged ownership period, ED&F Man did not hold any TDC shares.

Thus, the information on Kamco's ownership issued by ED&F Man is without foundation in factual data.

Kamco's "sale" in 2016 is constructed by ED&F Man lending TDC 3.5 million shares from ING Bank N.V. ED&F Man "sold" these shares to another ED&F Man account, after which ED&F Man "repurchased" the shares from the same account. The shares were thus simply "moved" back and forth between internal ED&F Man accounts to construct a "sale" of 2,901,000 shares.

The TDC trades for 2016 are presented in excerpt as Appendix AA3. At the beginning of 2016, ED&F Man did not hold any TDC shares in its accounts.

As Appendix AA3 shows, a large number of transactions are carried out in a few days in August. However, only two of the transactions are with an external party, ING Bank N.V.:

| Date | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-----------|-----------|-----------|---------|-------------|
| 09/23/2016 | SEB, acc. ING Bank N.V. | 09/22/2016 | Buy | 3,500,000.00 | 0.00 |
| 09/26/2016 | SEB, acc. ING Bank N.V. | 09/23/2016 | Sale | -3,500,000.00 | 0.00 |

As it appears, ED&F Man *borrows* 3,500,000 TDC shares from ING Bank N.V. on Thursday, September 22, 2016, which will be delivered on Friday, September 23, 2016.

The borrowed shares will be returned on Friday September 23, 2016, and the return will take place on Monday, September 26, 2016.

These *borrowed* shares are "sold" back and forth between ED&F Man's accounts many times during the borrowing period, including the following two transactions:

| Date | Cprt. | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|------|-------|-----------|-----------|---------|-------------|
| 09/23/2016 | MACVGB22XXX | 09/22/2016 | Sale | -2,901,000.00 | 115,401,780.00 |
| 09/23/2016 | MACVGB22XXX | 09/22/2016 | Buy | 2,901,000.00 | -115,403,230.50 |

The "sale" that is being conducted here on September 23, 2016, of 2,901,000 TDC shares and that was agreed upon on September 22, 2016, is being conducted at a price that precisely matches the "sale" that Kamco has presented as "documentation" for the pension plan to divest its alleged shareholding. It must therefore be Kamco's sale of shares.

The "Co-contractor" name field is empty for the two transactions, but an ID code, "MACVGB22XXX", is indicated. This ID code covers ED&F Man (Appendix AA6).

A review of the related Cash Account (excerpt provided as Appendix AA7) shows that – at least at the time of delivery – the shares were sold and then bought back *four minutes* later (my presentation of the information):

| | | | |
|---|---|---|---|
| [SALE] | at 05.15 | Securities sale | 115,401,780.00 CR |
| [BUY] | At 05.19 | Securities purchase | 115,403,230.50 DR |

This shows that ED&F Man <u>did not</u> sell 2,901,000 TDC shares for Kamco for DKK 115,401,780 in these transactions. Instead, ED&F Man moved 2,901,000 shares back and forth between two internal accounts, thereby constructing a "sale" with an account movement of shares and a cash flow.

The "sale" is thus contrived and without reality. The document (Appendix AA4, p. 5) does not show a sale of shares – only those 2,901,000 shares have been moved back and forth. And the payments almost look like a "fee" of DKK 1,450.50 (the difference in the two trades) was paid for the "inconvenience."

The transactions have thus only resulted in a *minimal* cash inflow of DKK 1,450.50.

It is *particularly* clear that ED&F Man could not have sold 2,901,000 TDC shares on behalf of Kamco on September 22, 2016. For ED&F Man *only held* borrowed shares in 2016. Namely the 3,500,000 shares that had been borrowed from ING Bank N.V.

### 5.2.3   ED&F Man never purchased, owned or disposed of the alleged 2,901,000 TDC Shares

Overall, the above shows that ED&F Man has not purchased 2,901,000 TDC shares on behalf of Kamco. Indeed, the "purchase" is merely internal entries between two of ED&F Man's accounts, which offset each other except for a net cash outflow (perhaps a fee) of DKK 1,885.65.

ED&F Man, in turn, has a large number of shares *borrowed* beyond the dividend date (ex-date of August 08, 2014), see, e.g., Exhibit AA1, p. 1. The "trades" can therefore – as in the case of Chr. Hansen shares (section 5.1, above) – have been intended to mask share lending in order to obtain dividend distribution on a false basis.

In addition, ED&F Man has not held any shares at all during the entire period for which Kamco claims to have held the TDC shares. For most of Kamco's alleged ownership period, ED&F Man held no shares in TDC.

Finally, the "sale" of the stock is also constructed. ED&F Man borrowed a share from ING Bank N.V., which was moved back and forth between two internal accounts at ED&F Man to construct a "sale" before the borrowed share was returned to ING Bank N.V.

These facts mean that "documentation" issued by ED&F Man is worthless. ED&F Man has in fact issued documentation for purchases, sales and shareholdings without the documents corresponding to the actual facts.

### 6.    Lack of documentation and inconsistent set-up
### 6.1    Purchase and sale confirmations provided do not document that the pension plan has bought shares

The pension plan has provided purchase confirmations from ED&F Man for each of the stock traders. However, there is no evidence that the purchase confirmations were sent to the Pension Plan or otherwise made known to the Pension Plan.

The purchase confirmations are, by the way, purchase confirmations sent as emails internally in ED&F Man.

Similarly, there is no evidence that the Pension Plan had any knowledge of the sales confirmations that were submitted.

In addition, no evidence has been provided that the Pension Plan has given purchase and sales orders to ED&F Man. This is particularly noteworthy when the Danish Tax Agency, in its submission dated September 27, 2018 (p. 27, request 7), already called on the Pension Plan to provide *all correspondence with ED&F Man*. It is also remarkable when considering that ED&F Man – according to the Pension Plan – has purchased shares on behalf of the Pension Plan for upwards of DKK 1 billion at a time.

In its submission of June 11, 2019, p. 15, the pension plan refers to the fact that a purchase confirmation (Appendix 13a) "specifically" states that the trade is made by ED&F Man on behalf of the Pension Plan. However, this does not alter the fact that no evidence has been provided either of a purchase order or of the purchase confirmation having been known by the pension plan.

It is incorrect for the Pension Plan to refer to Appendix 9d as "the appellant's order to make the sale" in its June 11, 2019, submission, p. 12. Appendix 9d is an internal ED&F Man email and appears to be a sales confirmation.

No evidence was provided of purchase or sale orders for any of the trades placed by the pension plan with ED&F Man.

It appears from the office minutes of May 10, 2019, p. 1, that the pension plan representatives *"believed"* that

> *"a framework agreement had been concluded between the pension plan and EDF on the purchase, sale of shares, etc., so there was no further correspondence on this subject."*

No evidence of the existence of such a framework agreement has been provided. It seems quite unbelievable that the pension plan does not have a (copy of) a framework agreement authorizing ED&F Man to purchase billions of shares on behalf of the pension plan. Even if such a framework agreement existed, it is quite unlikely that there would be no correspondence with explicit buy and sell orders when such large shareholdings are involved.

Nor, as the minutes of the meeting show, were any agreements presented between the pension plan and the trustee as to how the pension plan's modest funds were to be invested. Thus, the "documentation" provided does not substantiate the pension plan's alleged ownership of the shares, see also the Tax Agency's rulings, p. 2, 4th paragraph.

It is therefore undocumented that the pension plan should have authorized the trustee to trade large numbers of shares on behalf of the pension plan for borrowed money. It is also undocumented that the pension plan would have agreed to the trustee passing such a power of attorney to ED&F Man.

**6.2      The pension plan had no money and has not received any net dividends**
The Pension Plan is a "one-participant plan" (Supporting Appendix, Section 1.3), and thus, according to the 2016 IRS website, the annual contribution per participant is limited to a maximum of $53,000 ($59,000 for participants older than age 55), as shown in Exhibit H. No evidence has been provided that such contributions have actually been made to the Pension Plan.

Yet the pension plan claims to have owned shares in Danish C20 companies worth very large millions of euros (DKK).

The information about the pension plan's assets at the end of their fiscal year, as provided in Section 2.2 above, supports not only that the pension plan did not have a sufficient capital base to purchase the massive alleged shareholdings, but also that the pension plan did not receive the alleged net dividends. Thus, the alleged net gains are not reflected in the pension plan's assets.

It is stated in the Statement of Opposition, p. 3, that the pension plan made

> *"trades in Danish listed shares, all of which paid dividends".*

The Statement of Opposition further states, p. 4, that the submitted Credit Advices (Tax Vouchers)

> *"document both the dividend distribution and the withheld dividend tax."*

If the pension plan had actually received the alleged dividends, it would be able to provide objective evidence of this, for example in the form of a dividend statement, bank statement, fund/deposit statement or similar. However, the pension plan cannot prove that the alleged share transactions etc. have passed through the pension plan's finances, see also the Tax Agency's ruling, p. 2, 4th paragraph.

### 6.3    There is no evidence of funding

*It is undisputed that the pension plan did not* have the necessary capital base to make the alleged share purchases of several hundred million DKK. The pension plan needed external financing.

However, as mentioned above, the pension plan has not provided any evidence as to how the pension plan has *actually* financed the alleged very substantial share purchases in Danish listed companies, cf. also the Tax Agency's ruling, p. 2, 4th paragraph.

The Pension Plan states in its submission of June 11, 2019 (among other things, p. 8) that

> *"there appears to be no basis for addressing the issue of financing."*

The pension plan does not even try to explain how it has been able to finance share purchases of up to one billion DKK at a time, with its modest capital basis. In the Pension Plan's opinion, evidence of the financing of the share deals (including the specific contractual basis) is therefore irrelevant to the question of ownership. This is clearly wrong. For the issue in the case is whether the pension plan can prove to have acquired alleged massive shareholdings of several hundred million DKK. This requires financing, otherwise one cannot buy shares when one is not even close to having a sufficient capital base.

The pension plan did not have – and has never had – the necessary capital to make the massive investments in Danish shares that are the basis for the pension plan's claims for refund of the withheld tax.

The failure to provide the specific contractual basis for the financing is therefore of obvious evidential importance. When the pension plan cannot prove that it financed the purchase of the shares, the pension plan is forced to claim, contrary to all reality, that the financing is the irrelevant. Again, this demonstrates the lack of reality of the alleged stock transactions.

Incidentally, it is noteworthy that the pension plan will not even *explain* how the share purchases are financed. For example, in the leading case Del Mar Asset Management Saving & Retirement Plan (SANST case no. 180005308), where the pension plan is also represented by the Law Firm Lundgrens and where the pension plan has also "traded" shares through ED&F Man, there is at least *an attempt* to explain the funding.

The explanation is largely undocumented, but there is at least an attempt at an explanation. The pension plan in the present case has not bothered to do so.

The pension plan has *still* not provided evidence of having entered into financial agreements that would provide the pension plan with liquidity to make the alleged share purchases.

Nor *has* the pension plan provided any evidence of having hedged against price losses (which the pension plan would undoubtedly not be able to bear), for example by hedging in the form of futures, even though reference is made to futures in Appendix 16, for example.

In addition, the pension plan statements submitted to ED&F Man show very significant overdrafts without any documented collateral. As an example, Appendix 16 (p. 24) shows that on March 28, 2014, the pension plan had a negative 'Running Balance' of approximately DKK 2.4 billion.

It is highly unlikely that a financial company like ED&F Man would provide billions of credits without collateral. It was even more unlikely in the years immediately after the financial crisis. It should also be noted that any security in the shares would not adequately protect ED&F Man in the event of a fall in its share price.

The huge unsecured overdraft is in the entirety without explanation. The information supports that the account statement does not show the pension plan's share holdings. On the contrary, the account statement illustrates that the pension plan would not have the finances to trade such shareholdings as required to obtain the dividend distribution to which the pension plan claims to be entitled.

In addition, when you buy shares for such large amounts, you must also be able to bear any price loss. It is well known that even listed shares can suddenly decline in value, triggering large price losses. For example, on August 07, 2018, the price of Pandora shares fell by 18.5%, see Appendix L-M. So, if a pension plan claims to have purchased a Danish share with a value of DKK 1 billion, a 5% fall in the share price would result in a price loss of DKK 50 million. A loss that the pension plan would not be able to bear with its capital base. And the pension plan would not be able to bear a price loss of 18.5% at all.

The pension plan has thus not been a real player in relation to the alleged investments in Danish shares.

**6.4        There is no link between equities and the pension plan's finances**
The evidence provided by the pension plan does not prove that the pension plan has owned shares, if only because there is no link between shares/money and the pension plan's finances.

The alleged stock trades far exceed the pension plan's capital base, and the pension plan has not documented – or even explained – how the stock purchases are financed. However, according to the pension plan's ED&F Man account statements, it is apparently ED&F Man that is providing massive and unsecured credits. In other words, the shares were purchased with ED&F Man's money.

The pension plan still has not provided bank statements, and thus there is no documented cash flow between the pension plan's bank accounts and the account at ED&F Man. Therefore, firstly, there is no evidence that the pension plan has transferred funds to ED&F Man (e.g., to cover losses on equity investments). It is therefore also unclear who would cover the pension plan's losses of approximately DKK 30 million on Novo Nordisk shares (see Appendix 8a in conjunction with Appendix 8c) and approximately DKK 13 million on Coloplast shares (see Appendix 13a in conjunction with Appendix 13d). Secondly, it is not documented what happens to the pension plan gains. It is thus not documented that gains from investments, net dividends and refunds have entered the pension plan's bank account.

It is therefore not known where the pension plan gets the money for the massive share purchases, and it is not known where the pension plan's income goes.

In addition, the pension plan has not provided any evidence of the basis of the agreement between the pension plan and ED&F Man, respectively, the pension plan and the trustee, see also The Danish Tax Appeals Board's ruling, p. 2, 4th paragraph. Purchase and sale orders were also not provided.

The evidence provided regarding the purchase and sale of shares (purchase and sale confirmations, SWIFT notifications and account statements with ED&F Man) does not document the pension plan's ownership of the shares. As indicated, the following has not been presented:

- purchase and sale orders from the pension plan,
- evidence of ED&F Man's authority to trade billions worth of stock on behalf of the pension plan,
- proof that the purchase and sales confirmations have been made known to the pension plan,
- documentation (in the form of bank statements) of cash flows to/from the pension plan's bank accounts,
- documentation of the pension plan's hedging of foreign exchange risks,
- evidence of the funding of the pension plan.

It is thus not documented that the transactions have been made to the pension plan, nor that the transactions have passed through the pension plan's finances, see also the Danish Tax Agency's ruling, p. 2, 4th paragraph.

The share transactions thus have no link to the pension plan, but appear mostly as transactions by and for ED&F Man. In other words, the evidence presented shows at most that *ED&F Man* has bought or borrowed shares, but not that this has been done, where appropriate, on behalf of the pension plan and at the pension plan's expense and risk.

**7.    The Pension Plan has only partially responded to the requests from the Danish Tax Agency's and the Danish Tax Appeals Board**

In its submission of September 27, 2018, the Danish Tax Agency made the following 7 requests to the Pension Plan:

> "AIG **is requested (1)** *to provide its financial statements for 2012–2015, all bank statements for 2012–2015, and statements from the ED&F Man account for 2014–2015.*
>
> AIG **is requested (2)** *to disclose whether any amounts have been distributed by AIG at any time since inception to the current date and, if so, to provide evidence thereof, e.g., by providing Form 1099-R filed with the IRS.*
>
> The* Statement of Opposition, p. 3, that in 2014 A1G was advised to invest in Danish shares as a result of AIG being able to obtain a refund of withheld dividend tax. AIG **is requested (3)** to disclose who made this recommendation and to provide the recommendation.*
>
> AIG **is requested (4 )** *to disclose and document which investments AIG made prior to the investments in Danish shares.*
>
> The* Statement of Opposition *states on p. 5, that AIG received documentation from ED&F Man to have owned and held the shares in question at the time of the adoption of the dividend distribution. AIG **is requested (5)** to provide this documentation.*
>
> It appears from the decision made by the Danish Tax Agency, p. 16, that in the context of earlier audits on AIG's refund application, the Danish Tax Agency received selected parts of material from ED&F Man (Appendix G).*

> *The transcriptions are incomplete, with pages missing, and much of the text was illegible with crossings out. AIG **is requested (6)** to provide the material in full and without any crossings out.*
>
> *AIG **is requested (7)** to produce all correspondence with ED&F Man, including correspondence between AIG and ED&F Man and correspondence between ED&F Man and AIG's agents and other intermediaries."*

The pension plan has only partially responded to the calls:

> The pension plan has not provided financial statements or bank statements as requested (1).
> The pension plan has not disclosed and, where applicable, documented that any amounts have been distributed from the pension plan, as requested (2).
> The pension plan has not submitted the recommendation to invest in Danish equities as a result of the possibility to get refunded withheld dividend tax, cf. request (3).
> The pension plan has not documented its investments prior to the investments in Danish equities, see request (4).
> The ED&F Man pension plan account statement (Appendix 16) is still only available in a version that is largely illegible due to crossings out, as requested (6).
> The pension plan has not provided correspondence with ED&F Man, as requested (7).

In addition, it appears from the minutes of the office meeting, p. 1, that the Danish Tax Agency at the office meeting of May 10, 2019 requested the following *additional* material in response to the Danish Tax Agency's requests:

> Agreements between the pension plan and the trustee.
> Correspondence between the pension plan and ED&F Man.
> The framework agreement between the pension plan and ED&F Man relied on by the pension plan.

The pension plan has not provided this material either, see also the Tax Agency's ruling p. 2, 4th paragraph.

In a case specifically about whether the pension plan can prove ownership of the alleged shares, it is quite incomprehensible that no documentation has been provided which the Danish Tax Agency have expressly requested and which the pension plan *must have in its* possession."

## Supporting Appendix from the Danish Tax Agency dated October 18, 2019

> **"Supporting Appendix from the Danish Tax Agency**
>
> Table of contents

| | | | |
|---|---|---|---|
| 1. | PARTIES | | 2 |
| | 1.1 | Custodian | 2 |
| | 1.2 | Agents | 3 |
| | 1.3 | American pension plans | 4 |
| | 1.4 | Brokers | 6 |
| 2. | REFUND APPLICATIONS | | 6 |
| | 2.1 | Periods 2012-2015 | 6 |
| | | 2.1.1  Forms | 7 |
| | | 2.1.2  Credit Advice | 7 |
| | | 2.1.3  Form 6166 | 8 |
| | | 2.1.4  Power of Attorney | 8 |
| | 2.2 | New application process from 2017 onwards | 9 |
| 3. | AGREEMENT TYPES | | 9 |
| | 3.1 | Global Master Securities Lending Agreement (GMSLA) | 9 |

| | 3.2 | Forwards | 9 |
|---|---|---|---|
| 4. | CIVIL ACTION | | 10 |
| | 4.1.1 | Germany: Arrest for approximately 2.2 billion euros | 11 |
| | 4.1.2 | USA: Lawsuits worth approx. DKK 5.4 billion filed - and not dismissed | 11 |
| | 4.1.3 | Settlement: repayment of DKK 10 million and DKK 1.6 billion respectively | 12 |
| 5. | TAX DATA ANALYSIS | | 13 |
| | 5.1.1 | Basis for the Danish Tax Agency's analysis | 13 |
| | 5.1.2 | The result of the analysis | 15 |
| 6. | SHARE PURCHASE: TERMS OF SETTLEMENT NOT IN LINE WITH MARKET | | 17 |

**1.      Parties**

The group of cases relating to the refund of dividend tax concerns a total of 306 pension plans and companies from various foreign jurisdictions that, via agents, have *unjustifiably* requested the Danish Tax Agency to refund dividend tax totaling approximately DKK 12.7 billion in the period from 2012 to 2015. On the basis of the refund requests, the Danish Tax Agency has paid the requested amounts totaling approximately DKK 12.7 billion in the corresponding period. The payments were made to foreign bank accounts designated by and belonging to the agents.

Of the total of 306 pension plans and companies that have applied to the Danish Tax Agency for refunds of dividend tax, 277 pension plans are domiciled in the United States.

The various key actors and documents can be illustrated as follows:



**1.1      Custodian**
Generally, a custodian is a financial institution that holds clients' share holdings and other securities.

The Credit Advices (Tax Vouchers) submitted in the group of cases, which alone constitute the alleged "documentation" for the ownership of the shares and the receipt of dividends, have been produced by 12 different international custodian firms, listed below.

The breakdown of the claim amounts for which each custodian has provided claimed "evidence" (Credit Advices) can be calculated as follows (in proportion to the €12.7 billion *unduly* paid):

| Custodian | Total (DKK) |
|---|---|
| Solo Capital Partners LLP | 5,442,113,750 |
| Old Park Lane Capital PLC | 1,776,763,390 |
| North Channel Bank | 1,135,775,342 |
| Telesto Markets LLP | 925,443,359 |
| Lindisfarne Partners | 920,721,387 |
| West Point Derivatives Ltd | 880,884,044 |
| Indigo Securities Ltd | 688,383,335 |
| ED & F Man Capital Markets | 582,830,675 |
| Salagado Capital | 320,758,845 |
| Investec | 33,748,380 |
| BNP Paribas | 1,863,000 |
| Argon Markets | 810,000 |
| Grand total | 12,710,095,507 |

The custodians involved are all based in the UK, with the exception of Salgado Capital and North Channel Bank, which are based in the Comoros and Germany respectively.

### 1.2      Agents

All 306 pension plans and companies in the case applied for dividend tax refunds via a form system regulated by the Danish Tax Agency. The 306 entities used six international external advisory firms, so-called "agents," which forwarded the requesting entities' application for refund of withheld dividend tax to the Danish Tax Agency.

The distribution of refund requests between the six agents has been as follows:

| Agent | Paid (DKK) |
|---|---|
| Goal Taxback Limited | 4,549,985,549 |
| Acupay System LLC | 3,610,468,065 |
| Syntax GIS | 3,043,663,066 |
| KOI Associates | 1,220,975,179 |
| Global Equities GmbH | 262,207,548 |
| Globe Tax Services Incorporated | 22,796,100 |
| Grand total | 12,710,095,507 |

Goal Taxback Limited has played the largest role as agent in the group, having been involved in making claims for refund of dividend tax of approximately DKK 4.5 billion out of the DKK 12.7 billion defrauded.

Goal Taxback Limited is incorporated in England, as are Acupay System LLC, Syntax GIS and Koi Associates. The agents Globe Tax Services Incorporated and Global Equities GmbH are based in the USA and Germany respectively.

The agents were responsible not only for the distribution of material but also for direct communication with the Danish Tax Agency and for sending the documentation for the refund applications.

In their requests to the Danish Tax Agency, the agents indicated, on behalf of the 306 pension plans and companies, the foreign bank accounts to which they wanted the refunded amounts to be transferred. All the bank accounts used by the agents were accounts of the agents. And the Danish Tax Agency, on the basis of a review of the requests, paid all the amounts relating to the requests into the bank accounts designated by the agents.

### 1.3    American pension plans

The vast majority of the 277 US pension plans have been "401(k) plans," according to the information provided to the Danish Tax Agency. The designation refers to the fact that the pension plans have been established under the terms of Section 401(a) of the US Internal Revenue Code ("IRC").

A 401(k) plan is established by an employer for the benefit of its employees. It is a prerequisite for the establishment of a pension plan that the employer has an Employer Identification Number (ENI), which is assigned by the US tax authorities, the IRS. Furthermore, it is a condition for the creation of 401(k) plans that there is a formally adopted *plan document* and that there is a separate agreement with a trustee. The *plan document* must govern the terms of the pension plan, including compliance with the IRC and, if applicable, the Employee Retirement Income Security Act ("ERISA"), as well as other applicable laws. The agreement with the trustee shall govern how the pension plan funds are to be invested and managed.

Contributions to 401(k) plans can be made by both employees and the employer according to the pension plan's *plan document* and the limits set by the IRC. Except for exceptions regarding the accrual of contributions at year-end changes, contributions to a 401(k) plan for each participant (both employer and employees) cannot exceed the lesser of 1) an amount limit that is periodically adjusted for inflation ($53,000 in 2016 or $59,000 for participants aged 55 or older) and 2) 100% of the participant's compensation from the employer that year. The amount limit is lower for certain types of 401(k) plans.

Generally, 401(k) plans can only make payments as distributions to participants or to cover allowable expenses of the pension plan. Distributions to participants may only be made under certain circumstances, such as termination of employment, financial hardship, death, disability, age (59-1/2 years) or termination of the pension plan without succession. Such distributions must be reported to the IRS on Form 1099-R. It should be noted that other forms may be required if the distribution is made to a non-resident of the United States.

Contributions to 401(k) plans must be held in a separate fund managed by one or more trustees, who – with certain exceptions – have exclusive rights to manage the pension assets, including to make investments of the funds.

In the present case, the trustees concerned have acted as trustees of the pension plans at a general level. The Trustee has signed powers of attorney on behalf of the pension plan <u>and</u> on behalf of the employer who set up the plan. There are approximately 70 different trustees involved in the case. The vast majority are resident in the United States. Of the 70 trustees, 4 trustees represent a total of 156 of the 277 US pension plans.

The vast majority of the 401(k) plans involved in the case are of the "One-participant plans" type, as is also evident from the Danish Tax Agency's revocation decisions where this is the case. "One-participant plans are pension plans for business owners who do not have employees in the associated business (other than the owner's spouse, if any). These pension plans thus consist, as the wording suggests, only of the owner (and possibly his/her spouse). The pension plan is otherwise subject to the same rules and requirements as other 401(k) plans, except ERISA.

"One-participant plans" are not required to file financial information (Form 5500) with the U.S. authorities when they have assets of $250,000 or lower at the end of the plan year.

If one-participant plans have assets in excess of $250,000, they are required to file financial statements (Form 5500) with the U.S. authorities. This obligation is usually fulfilled by filing Form 5500-EZ, but may in some cases be fulfilled instead by using Form 5500-SF.

Of the 277 pension plans in the case, the vast majority have not filed Form 5500. It must be assumed that the remaining pension plans did not have assets in excess of $250,000 at the end of their *plan* year.

401(k) plans offer a number of tax advantages in the United States. For example, the employer is entitled to deduct contributions to the pension plan, the employee is exempt from tax on contributions to the pension plan, and the pension plan's funds/income are exempt from income taxation. In addition, in double tax treaties with the US, 401(k) plans are granted some tax benefits, including the right to a refund of dividend tax on foreign shares. When these benefits are claimed in other countries, the pension plan must prove that it is domiciled in the United States.

### 1.4    Brokers

Generally, a broker is a middleman between investors who want to buy and sell securities. The broker is typically paid a fee for his role.

The broker arranges for the matching of the buyer and seller and thus the conclusion of the purchase agreement (executing broker) and/or for the completion of the transaction (clearing broker), i.e. the exchange of the parties' services.

### 2.    Refund applications
### 2.1    Periods 2012–2015

From 2012 to 2015, the pension plans requested that the Danish Tax Agency refund the withheld dividend tax, referring to double taxation agreements between Denmark and the country in which the pension plans were domiciled.

The refund requests were submitted by a number of international agent companies via the form system. The agents acted on behalf of the pension plans.

The requests were accompanied by the following:

1.  Form 6.003 ENG - Claim to Relief from Danish Dividend Tax (section 2.1.1, below),
2.  Certificate issued by a custodian in the form of, for example, a "Credit Advice" for the ownership of the shares in question and the receipt of dividends on the shares (section 2.1.2, below).
3.  IRS Form 6166 (for the 277 US pension plans) (section 2.1.3, below) and
4.  Power of Attorney from the Pension Plan (Section 2.1.4, below),

On the basis of the pension plans' requests, the Danish Tax Agency paid the amounts requested into the agents' accounts, provided the appropriate documents were attached. The Danish Tax Agency did not carry out any actual processing of the payments.

In the cases where the Danish Tax Agency has decided in 2018 to revoke the previous decisions to refund withheld dividend tax, it is the Danish Tax Agency's opinion that the submitted documents are invalid and that the refund has been unjustifiably paid.

### 2.1.1    Forms

The claim forms shall specify, among other things the amount which the agent (on behalf of the pension plan) is seeking to recover and that the amount is to be paid into the agent's bank account. Furthermore, the agent declares that the pension plan is the beneficial owner of the shares in question.

Requests submitted in the specific leading cases are discussed below in section 6.

### 2.1.2    Credit Advice

As the only "evidence" of the pension plans' claim for refund of withheld dividend tax, the requests were accompanied by Credit Advices (Tax Vouchers) issued by various custodians (wealth managers). These Credit Advices are issued and submitted as "evidence" that the pension plans have owned shares in Danish C20 companies, that the pension plans have received dividends from these companies and that dividends received have been subject to dividend tax.

All Credit Advices issued by the Solo Group (i.e., Solo Capital, Old Park Lane, West Point, and Telesto) are assigned an ID number.

These Credit Advices show – apparently – which Danish shares the pension plans owned, which dividends had been distributed to the pension plans and which dividend taxes had been included in the distributions.

However, in the cases where the has decided in 2018 to revoke the previous decisions to refund withheld dividend tax, it is the Tax Agency's perception that the Credit Advices submitted are without substance.

### 2.1.3    Form 6166

Form 6166 (Certification of US Tax Residency) is a certificate issued by the United States Treasury Department to show that an individual or corporation is resident in the United States for US tax purposes. The certificate is issued by the Treasury Department based on the pension plan's submission of Form 8802 (Application for United States Residency Certification).

The information in Form 8802 is submitted under oath and is not verified by the Treasury Department upon issuance of Form 6166. All of the 277 U.S. 401(k) pension plans in this case have attached Form 6166 to their applications.

The Form 6166 certificate certifies that a legal entity is domiciled in the United States for U.S. tax purposes. It should be noted that the certificate <u>does not</u> document whether the other conditions for receiving a refund of withholding tax on foreign shares are met under a double tax treaty, including whether the applicant is the beneficial owner of the shares on which the refund is sought.

To meet the requirements to receive the certificate, the retirement plan must submit a copy of the signed Form 5500 or an IRS determination letter or a statement (made under penalty of law) as to why the pension plan is not required to file Form 5500 and why the pension plan does not have an IRS determination letter.

### 2.1.4    Power of Attorney

The Power of Attorney submitted authorizes the agent to apply on behalf of the pension plan, among other things, for a refund of withheld dividend tax and to receive refunded amounts from the Danish Tax Agency.

### 2.2    New application process from 2017 onwards

In early 2017, the Danish Tax Agency launched a new IT solution for reporting dividend tax refund requests. The IT solution works as "TastSelv," where the refund request is uploaded with the corresponding documentation.

The Danish Tax Agency website states that it is a condition for dividend refunds that Danish dividend tax is withheld from the dividend for which refund is sought ("condition 3") and that the shareholder is the legal owner of the shares at the time the dividend is declared ("condition 4"), see Appendix E.

As evidence of compliance with conditions 3 and 4, according to the Danish Tax Agency's website, the following may be submitted: dividend note or notification from the custodian bank of the dividend received, account statement, custodial account statement including, among other things, an overview of the shareholding at the time of the adoption of the dividend and the purchase record, cf. Appendix E.

### 3.    Types of contracts
### 3.1    Global Master Securities Lending Agreement (GMSLA)

A GMSLA is a standard for loan agreements developed by ISLA (The International Securities Lending Association). The standard agreement allows securities, such as shares, to be lent across national borders.

The GMSLA contains a number of standard terms and conditions, in addition to which there is various information that the parties must fill in specifically.

The GMSLA is thus a *framework agreement*. This means that the GMSLA sets the framework in terms of the share lending. However, the GMSLA has no effect unless the parties *actually* enter into share loan agreements, in which case the terms of the GMSLA will apply.

### 3.2    Forwards

A forward is a forward contract. It can be a binding agreement for the future delivery of a currency or commodity at a pre-agreed date and price. The forward contract thus provides a hedge against the time of future delivery, as the parties to the contract know the price at which the commodity/currency will be traded in advance.

The forwards agreement *does not* need to be tied to physical delivery of the asset, but can also be settled by *difference settlement*. This means that at the end of the forward contract, instead of delivering the currency/asset (e.g., a share), the parties settle the difference between the market price and the price agreed in the forward contract.

In the case of difference settlement, it is not necessary for the parties to actually possess the asset to which the ward contract is tied, as the asset does not have to be delivered, but is only used to establish a payment obligation.

### Example

A and B enter into a forward on August 01, 2019. The agreement is that on September 01, 2019, A will acquire B's Novo Nordisk shares, which on August 1 have a market value of DKK 1 million, for DKK 1.01 million.

For the sake of the example, on September 01, 2019, the agreement will be settled. The market value of the share is assumed to have increased to DKK 1.2 million.

The settlement can then either be made by A buying the shareholding from B for DKK 1,01 million. Or the settlement can be made by difference settlement:
The parties had agreed to trade the share for DKK 1.01 million, but the share has a value of DKK 1.2 million (the market price, also called the spot price). The share is therefore worth DKK 190,000 more than the price agreed by the parties. B must then pay A DKK 190,000, which is the difference between the agreed price and the market price on the expiry date.

### 4.    Civil legal action

The Danish Tax Agency has taken a number of civil actions in the case in several jurisdictions, including the US, Germany and the UK. This is with a view to recovering financial losses to the State of over DKK 12.7 billion unduly paid into the accounts designated by the agents. The Danish Tax Agency has thus brought both recovery and compensation claims against a number of different actors in the case in order to establish their respective payment obligations.

Including all pension plans represented by the Law Firm Lundgrens have been sued with demands for payment.

No final decisions on the merits of the case have yet been made.

However, there are a number of cases where foreign courts have ruled on (parts of) the number of cases and where the decisions are not subject to confidentiality:

#### 4.1.1    *Germany: Arrest for approximately DKK 2.2 billion*

In June 2018, civil seizures and arrests were carried out in various jurisdictions, including Germany. In connection with the arrests, the Danish Tax Agency has described and provided evidence of the alleged fraud in the complex of cases.

In order to be successful in a request for arrest in Germany, three conditions must be met:

1. there must be a legal basis for the claim against the owners,
2. there must be a preponderant probability that the assets in question actually belong to funds designated by the Danish Tax Agency, and
3. there must be a risk that the assets are moved or lose their value to the detriment of the Danish Tax Agency, if the arrest is not carried out.

The Danish Tax Agency has carried out arrests in Germany for approximately DKK 2.2 billion.

#### 4.1.2    *US: Lawsuits for approximately €5.4 billion filed - and not dismissed*

In the US, the Danish Tax Agency has retained a US law firm to advise on the possibility of pursuing the recovery and damages claims in the US against the US pension plans involved. A total of 155 lawsuits have been filed in a number of U.S. courts, primarily in New York, in the period ending June 15, 2018, against pension plans, officers and trustees of those pension plans and, in some cases, third parties related to the pension plans and the applications. In total, litigation has been filed for approximately DKK 5.4 billion.

All US pension plans represented by the Law Firm Lundgrens have been subpoenaed.

The first hearing in a series of the lawsuits was held on June 26, 2018, in New York.

The pension plans filed a motion to dismiss the cases with the Court for the Southern District of New York. The Pension Plans argued, among other things, that the court lacked jurisdiction because the Danish Tax Agency's claims – according to the pension plans – are governed by the common law doctrine of "the revenue rule," which implies that US courts do not have jurisdiction over cases that directly or indirectly seek enforcement of foreign countries' tax laws. In other words, the rule means that foreign tax authorities cannot bring claims that can be directly or indirectly characterized as tax claims before US courts.